# SUPREME COURT

AT THE

## JANUARY TERM, 1878.

---

Present:

Hon. DECIUS S. WADE, CHIEF JUSTICE.
Hon. HIRAM KNOWLES, } JUSTICES.
Hon. HENRY N. BLAKE, }

---

BELK, appellant, *v.* MEAGHER ET AL., respondents.

EVIDENCE — *district records.* When the original record books of a mining district are proved to have been lost, a copy of such records, made by a deputy recorder, under a law requiring district records to be filed in the county recorder's office, in a book which has been recognized by usage and preserved in the recorder's office, is better evidence of location appearing therein than the bare memory of witnesses, and the best that the nature of the case admits.

WITNESSES TO A DEED — *acknowledgment — certificate.* Under the statutes of Montana pertaining to conveyances, no subscribing witnesses are required to a deed, when the same is properly acknowledged. A deed may be entitled to record by proof of witnesses without acknowledgment. When by either method it is once recorded, it is good notice to third parties.

MINERAL LAND ACT — *how title acquired and preserved — nature of title — forfeiture.* Under the act of congress of May 10, 1872, representation by

VOL. III — 9

annual performance of labor is constituted one of the muniments of title. No forfeiture can take place till after the full completion of the year, during which, by law, representation may be made.

The right acquired by a locator of mineral ground on the public domain, acting in accordance with the provisions of law and local laws, rules and regulations, is.a legal and exclusive right of possession, and so long as this right is kept alive by representation, no one else has the right to enter upon and re-locate the same. Such entry and re-location would be void and constitute no foundation to a valid claim or give any right of possession.

When the original locator and his grantees have failed to represent a claim by doing the work required during any one full year, he who first locates the same, after the expiration of the year, acquires the best title thereto.

*Appeal from Second District, Deer Lodge County.*

J. F. FORBIS, A. E. MAYHEW, SHARP & NAPTON, and E. W. TOOLE, for appellant.

The court below erred in admitting copy of records of Summit Valley Mining District. There is no law authorizing copies of such district records to be received as evidence. There was no evidence of the copy being correct, either by the party who copied it or by any one who compared it afterward.

The deeds showing outstanding title in Murphy should not have been admitted in evidence ; they were not witnessed or properly acknowledged. Codified Statutes, 396, §§ 1, 3, 23 ; 4 Am. Rep. 430 ; 6 Wheat. 577 ; 2 Mont. 59 ; 3 N. H. 234 ; 5 Ohio, 190 ; 82 Mass. 48 ; 22 Pick. 295.

These deeds, if admissible, could only have established an equitable title, unavailable to a stranger seeking to evict a third party. 5 Ham. (Ohio) 194.

The occupant of mineral land under the United States laws, before a patent issues, has only an inchoate title, a possessory right. See 4 Otto, 762. The absolute title is in the United States. In this action it is incompetent for defendants to show title in the government or a stranger. The object of the action is to show that the entry was a trespass on the rights of the true owner. Such title is unavailable to defendants. 10 Cal. 30 ; 24 id. 347–8 ; 28 id. 323–4, 218 ; 47 id. 257 ; 45 id. 101–5 ; 38 id. 370 ; Tyler on Ejectment, 72–4.

The court erred in refusing the testimony of McFarland.

It was error to allow defendants to testify as to amount of work done and money expended by them while in possession. Such evidence did not affect the title.    42 Cal. 407 ;  38 id. 278 ; 2 Col. 19;  37 N. Y. 407.

The stale claim of Murphy to the original lode ought not to have been allowed to figure at all in this case.

Even if Murphy's claim had not been forfeited at the time of plaintiff's location, it became so while he was in possession and two months before defendants' entry.                          °

Murphy's claim was not only forfeited under the laws of the United States, but was barred by the Statute of Limitations. Codified Statutes, 591–2 ; 2 Mont. 394; U. S. Rev. Stat. 427, § 2324 ; 2 Black (U. S.), 605 ; 9 Nev.; 43 Cal. 65, 73, 251–2.

If the plaintiff's right of possession was good against the claimants of the original lode, it ought to be still stronger as against the defendants.

The plaintiff was first in time and should be first in right as against defendants and all others.


W. W. DIXON and J. C. ROBINSON, for defendants.

The district records of Summit Valley district were properly admitted in evidence.    Having shown that the original record was lost, that the copy offered was made by one duly in charge as deputy recorder, it devolves upon plaintiff to show that it was not a correct copy.

All district records existing in December, 1864, and deposited with county recorder prior to April 17, 1865, became county records. Bannack Statutes of 1864–5, 374 ; also same statutes, 328.

The deeds were properly admitted in evidence.    A deed under our statute does not require witnesses, and as between parties thereto, is good without acknowledgment. 3 Washb. Real Prop. 321, and authorities there cited; *Sanders* v. *Bolton*, 26 Cal. 393 ; *Hastings* v. *Vaughn*, 5 id. 315 ; *Ricks* v. *Reed*, 19 id. 551 ; 4 Kent, 456 ; 1 Mont. 688.

Whatever may be held as to the title conveyed by the deeds there was representation in 1875 by Humphreys, one of the first locators.

Defendants do not attempt to show outstanding title in a third party, but simply to show that the original location was kept alive and had not been forfeited at the time of plaintiff's attempted location. At that time there was nothing for the United States to grant or for plaintiff to locate. *Reid* v. *Disbrow*, 9 Cal. 1; *Dyson* v. *Bradshaw*, 23 id. 528; *Roberts* v. *Chan Tin Pen*, 23 id. 260.

It was competent for defendants to prove the work done after location as evidence of possession and good faith.

When a party admits testimony without objection, he cannot afterward move to strike it out. *People* v. *Long*, 43 Cal. 444.

A location made before a forfeiture accrued is void. U. S. Mining Decisions, 188; Weeks on Mineral Lands, 109, 150, 157; *Pralus* v. *Pacific G. & S. M. Co.*, 35 Cal. 30.

The law operates as a grant to persons qualified to take it. *Robertson* v. *Smith*, 1 Mont. 410.

The law requiring work makes a condition subsequent to the grant. *King* v. *Edwards*, 1 Mont. 235.

Breach of condition subsequent does not defeat estate until entry by grantor or his heirs. The entry must be subsequent to the breach. No advantage can be taken of a breach of condition while one is in wrongful possession. 1 Washb. Real Prop. 477; 2 Greenl. Ev., § 323.

The Statute of Limitations could not affect a right given by act of congress — it only goes to the remedy. Before plaintiff could acquire any right of action under the statute he must have held adverse possession for one year.

WADE, C. J. In this action the plaintiff avers that he is the owner of and entitled to the possession of a certain quartz lode claim known as the Anna Maria lode claim, situate in the Summit Valley mining district, Deer Lodge county, which claim of ownership is disputed by defendants, who, as the plaintiff alleges, are now wrongfully in the possession, claiming title, and in order to a proper solution of the questions of law arising in the case, a statement of facts becomes necessary.

It appears from the evidence that on the 19th day of December, 1876, the plaintiff located the ground in dispute, after having

discovered a lead thereon, by posting notices of location and marking the boundaries thereof as the law requires, which notice of location was on the 21st day of December, 1876, filed for record in the recorder's office of Deer Lodge county. Subsequently to the location of the claim, the plaintiff worked thereon at different times, in all amounting to about two days' work, the last of which work was performed on or about the 15th day of February, 1877. It further appears that the defendants, Henry Meagher and Antoine Gagnon, on the 21st day of February, 1877, located the ground in question, after the discovery of a lead thereon, under the name of the Gagnon lode claim, by posting notices of location and marking the boundaries thereof, and have since their location worked and mined the claim.

The defendants, to defeat the title of the plaintiff, and to show that at the time he made his location and claim to the ground in dispute the same was not subject to location, but on the contrary that the possessory right and title to the same was held and owned by third persons, by virtue of a location long prior to that of the plaintiff, which right had been kept alive and in full force by proper representation and labor thereon, and therefore that the alleged right and title of the plaintiff was void, introduced in evidence and established the following facts, which appear from the testimony of William O. Humphrey as follows :

"I am acquainted with the ground in dispute and with the old original lode; I know the ground Mr. Clarke now owns and also the ground of the National Mining and Exploring Company. Am acquainted with the ground lying between these claims. The ground here in dispute is what is known as the west one-half of Discovery claim, claim No. 1, and part of claim No. 2, west from Discovery on original lode. These claims were located by William Allison and myself; we located Discovery claim and claims Nos. 1 and 2 west. We staked and recorded these claims; the hole I sunk there is on west half of Discovery claim. I think we located claims in July or August, 1864. When I sunk Discovery hole I found a pretty good copper vein carrying silver; I found what I call wall-rock, and staked the ground. I think we put up a stake at each end of

Discovery claim, and a stake at the end of every 200 feet claim after. We put up notice claiming Discovery claim, and claims 1 and 2 west. We recorded claims in district records on sheets of paper attached together in book form, and it was understood at the time that the district records were made on slips of paper, that they were to be copied into a book as soon as we got one. This (referring to a book of records taken from the county recorder's office) was the first book we got, and it was copied into this book which was the first book of county records, and these records were afterward copied into the county recorder's records. I was county recorder and turned records over to Judge LEWIS, my successor. I would know district records if I could see them (records produced); I think that is the book; I think the hand writing in the book is that of Mr. Fisk, he was doing work for me. I believe this is the book in which district records were copied. I think this is the book I had when county recorder. Mr. Fisk was deputy recorder and did most of the work. I wont be positive that the original lode was recorded in this book, it may be that it was recorded in a smaller book, used for district record, and then copied in this book. Mr. Allison was district recorder, I think, when original lode was recorded. These district records were kept until a county recorder was appointed. I was appointed county recorder by Governor Edgerton; I think I received my appointment about December, 1864. Part of the book is copied from district records. District records were delivered to me when I was appointed county recorder. All that was in old district records up to time of my appointment was copied into this book. We issued certificates of location from such records copied into this book. The signature in back of book purporting to be mine is not mine. I think same party that signed the rest signed my name (referring to page 30, witness said) I wrote name of G. O. Humphrey on this page, but no other names that appear on page. I cannot say why I have written some and other parties have written rest. I think district records were copied just as they appeared on old records; I turned this book over to Judge LEWIS, county recorder, who was my successor, in the winter of 1864-5 or spring of 1865. These

books were recognized as the records of the district by the miners generally. I gave the book to Judge E. E. Lewis, county recorder, at Butte or Silver Bow; he moved his office from Butte to Silver Bow. The county seat was where the records were. I was appointed county recorder by Governor Edgerton, during session of legislature, I think about December, 1864. I think I entered upon the discharge of my duties about one month after my appointment. I did some recording in district records after I was county recorder and made entries on record after my appointment. I can't fix date exactly when I delivered district records to Judge Lewis, county recorder. This book is partly copied from old district records. I don't know what became of old district records after they were copied; I do not know where they are; I think they are lost, I haven't them in my possession. The old records were partly on slips of paper fastened together and made into book form, and then copied into this book. I think these slips are lost. They came into my possession in 1864; I got them as soon as I went into office; I think papers are not in existence; I think Mr. Fisk copied records of original lode. He was deputy recorder; I cannot say that I was present when he copied record or that I compared it; I think it is a true copy, but cannot say positively; I cannot say that I know it is a true copy; I think it is a true copy because Mr. Fisk copied it; I authorized him to make copy. If I had not thought Mr. Fisk would make correct copy, I would not have employed him. Mr. Fisk is somewhere in the eastern States.

Henry S. Clark testified: "I am county recorder of Deer Lodge county. This is one of the books of record in my office. I found this book in the office when I took charge of the office. I have no slips of paper attached together in book form or otherwise purporting to be the records of Summit Valley mining district."

The book was then received in evidence as containing a record of the location of the original lode and claims thereon.

It further appears that on the 22d day of June, 1872, by deed of that date, William Allison and wife conveyed to Joseph D. Binns all their interest in the original lode, being an undivided

one-half of the property described in the deed, except as to claim No. 2 west, which deed was signed and sealed by the grantors, but not witnessed, and the certificate of acknowledgment to the same was defective.   On the 5th day of September, 1872, Binns, by his deed, conveyed to John C. C. Thornton, which deed was signed and sealed by the grantor, but not witnessed, and the cer- tificate of acknowledgment to the same was also defective.

On the 31st day of May, 1872, G. O. Humphrey and others, by their deed of that date, conveyed their interest, being an un- divided one-fourth interest in the property described in the deed, except as to claim No. 1, west, to John C. C. Thornton, which deed was properly signed and acknowledged, but the signatures thereto were not witnessed.   The property described and con- veyed in these deeds as parts of the original lode is a part of the same ground and property claimed by the plaintiff and de- fendants in their respective locations.   In the spring of 1875, Thornton caused the ground and lead in question to be properly represented, and employed Humphrey and others to perform the necessary labor thereon for that purpose.   On the 28th day of January, 1876, Thornton and wife conveyed to John T. Mur- phy, and neither Murphy nor Thornton represented the ground for 1876.

Upon these facts several questions arise.   Was the book con- taining a record of the original lode properly received in evi- dence?

Were the deeds from Allison and wife to Binns, from Binns to Thornton, and from Humphrey and others to Thornton ad- missible in evidence ?   What interest does a person locating a mining claim upon the public mineral lands, in pursuance of the law and the local rules and regulations, acquire therein, and how is such interest kept alive so as to prevent a forfeiture and defeat a relocation ?

1. As to the admissibility of the book of records. Several facts in this connection are not controverted.   The act of the legisla- ture of January 17, 1865, required all mining district records to be deposited in their respective county recorder's office, and when so deposited, that they become part and parcel of the county rec-

ords.    Probably under the operation of this statute the district
records of the Summit Valley district, which had been kept on
sheets of paper fastened together in book form, found their way
into the recorder's office of Deer Lodge county, and became a
part of the records thereof. This district record contains the origi-
nal record of the original lode and claims thereon. This rec-
ord is lost.    When it reached the office of the county recorder,
that officer had it copied into a book of records which has since
been recognized by the miners of the Summit Valley district as
the record of such district, and from which certificates of location
of claims issued.    There is no direct proof that this record is a
copy of the original.    This book of records containing a record of
the original lode was found in the office of and among the records of
the county recorder.    This is *prima facie* proof that the record
is genuine and correct.    Mr. Fisk was deputy recorder and prob-
ably sworn to a faithful discharge of his duties.    He copied the
old district record into the county record introduced in evidence,
and though the recorder could not say that he was present when
this copy was made, or that he had compared it, yet he believed
it to be correct and it was so recognized.

Records when lost or destroyed may be proved either by copy
or by the recollection of witnesses (1 Wharton on Evidence, §
135, and cases there cited), and the question we are to consider
is whether or not the record, as introduced in evidence, was bet-
ter evidence of the location of the original lode than the recol-
lection of witnesses would have been?    It was necessary to in-
troduce the best evidence, and the original record being lost and
the testimony tending strongly to show that the copy preserved
in the county records is correct, we think such evidence better
and of higher grade than would have been the bare memory of
witnesses.    We are satisfied that the record received in evidence
as proof of the location of the original lode was the best evi-
dence that the nature of the case admitted of, and therefore that
it was properly received.

2. As to the admissibility of the deeds.    The deeds from Alli-
son and wife to Binns, and from Binns to Thornton were de-
fectively acknowledged.    We have held that the acknowledg-

ment is no part of a deed, and that as between the parties thereto, a deed would be good without any acknowledgmen (*Taylor* v. *Holter et al.*, 1 Mont. 688), and as against third persons who were seeking to locate the ground, if the grantees in such defective conveyances had represented the ground named therein according to law, and a forfeiture had thereby been prevented, such deeds and representations would defeat any relocation of the ground.

The original location being valid and the ground having been represented as the law requires so that no forfeiture has occurred, a defective conveyance would not create a forfeiture and subject the ground to relocation. Even if the Allison and Binns' deeds were void and the deed from Humphrey to Thornton, being for an undivided one-fourth interest in the property, was valid, such deed would preserve the rights of Thornton to represent the ground and prevent a forfeiture.

There were no witnesses to the deed from Humphrey to Thornton. Did this fact invalidate the deed under our statute? The statute provides (Codified Statutes, p. 396, § 3) : "Every conveyance in writing, whereby any real estate is conveyed or may be affected, shall be acknowledged or proved and certified in the manner hereinafter provided." The statute then provides who may take the proof of acknowledgment; requires the officer taking the same to grant a certificate thereof, which shall be indorsed or annexed to such conveyance; what the certificate shall contain and the form thereof. And section 10 is as follows : "The proof of the execution of any conveyance whereby any real estate is conveyed or affected shall be : *First.* By the testimony of a subscribing witness; or *Second.* When all the subscribing witnesses are dead or cannot be had, by evidence of the handwriting of the party, and at least one of the subscribing witnesses." The statute then provides in substance, that no proof of a subscribing witness shall be taken unless such witness be personally known to the officer taking the proof to be the person whose name is subscribed to the conveyance as a witness thereto, or shall be proved to be such by the oath or affirmation of a credible person; that no certificate of such proof shall be granted unless such sub-scribing witness shall prove that the person whose name is sub-

scribed thereto as a party is the person described in and who executed the same, and that such person executed the conveyance, and that such witness subscribed his name thereto as a witness thereof.  The statute then provides what the certificate of such proof shall contain, and how the proof of the handwriting of the party, or of the subscribing witness, shall be taken.  And section 18 is in the following words : " A certificate of the acknowledgment of any conveyance, *or the proof of the execution thereof*, as provided in this act, signed by the officer taking the same, and under the seal of the officer, shall entitle such conveyance, with the certificate or certificates as aforesaid, to be recorded in the office of the recorder of any county in this Territory."

The provisions of the statute when taken and construed together are not ambiguous or uncertain.  It is evident that the object and purpose of the certificate of acknowledgment and also of proof of the execution of a deed, as the statute contemplates, is to authorize the deed to be recorded.  In the absence of a certificate, and there being no proof of the execution of the deed, the same cannot be recorded ; but either a certificate of acknowledgment or proof of execution under the statute, so authenticates the deed as to qualify it for record.  And so when there is proof of acknowledgment and a certificate thereof annexed or attached to the conveyance no witnesses are required and the conveyance is entitled to be recorded.  And when there is no certificate of acknowledgment, but proof of the execution of the deed can be made by the subscribing witnesses thereto in the manner provided by the statute then the conveyance is also entitled to record.  The object of the record of a deed, and hence of the certificate of acknowledgment and proof of the execution thereof, is to impart notice to third persons.  And hence it follows that neither the certificate of acknowledgment nor the attestation of subscribing witnesses are necessary to the validity of a deed, as between the parties thereto, and in no case where there is proof of acknowledgment and certificate thereof annexed or attached to a deed, and the same has been admitted to record by virtue of such certificate, are subscribing witnesses necessary to the validity of such deed as to third persons.

Section 24 of the same statute provides as follows : " Every conveyance and instrument in writing, acknowledged or *proved* and *certified* and recorded in the manner prescribed in this act from the time of filing the same with the recorder for record, shall impart notice to all persons of the contents thereof, and subsequent purchasers and mortgagees shall be deemed to purchase and take with notice."

And so it is obvious from the statute, when taken as a whole and construed together, that the object of a certificate or proof of execution is to entitle a deed to record, and that when by virtue of such certificate or proof a deed is entered of record, and recorded, it is good and imparts notice to third persons, in the absence of a certificate of acknowledgment, but accompanied with proof of execution, or in absence of proof of execution, but accompanied with a certificate of acknowledgment.

It follows, therefore, that the deed from Humphrey to Thornton which had no subscribing or attesting witnesses, but was properly acknowledged as the statute requires and recorded, was good as between the parties thereto and as to third persons, and imparted notice to all the world.

3. This deed being good to all intents and purposes, and conveying to Thornton an interest in the property in question which he rightfully held and owned in the spring of 1875, when he caused the ground to be represented, it follows that he had the right to make such representation in order to protect and to save from forfeiture his interest in the property. Having made the representation in the spring of 1875, when, under the law, was it necessary for him again to represent the ground in order to prevent its relocation ?

Section 5 of the act of congress of May 10, 1872, entitled " an act to promote the development of the mining resources of the United States," provides as follows: " On each claim located after the passage of this act, and until a patent shall have been issued therefor, not less than $100 worth of labor shall be performed, or improvements made during each year. On all claims located prior to this act (which is applicable to the case we are considering) $10 worth of labor

shall be performed or improvements made each year for each 100 feet in length along the vein until a patent shall have been issued therefor, but where such claims are held in common, such expenditure may be made upon any one claim, and upon failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made. Provided that the original locators, their heirs, assigns or legal representatives have not resumed work upon the claim after such failure and before such location."

Under this statute representation is the muniment of title. If representation fails the title is gone ; if there is a forfeiture the claim becomes again subject to location unless after the forfeiture work is resumed before the rights of third parties intervene by relocation. On each claim located prior to the passage of this act, $10 worth of work shall be performed or improvements made during each year for each 100 feet of such claim in order to prevent a relocation. The person making the location has one whole year in which to make the representation, and after having made one representation he has the whole of the next year in which to make the next representation. Having the whole year in which to make the representation, there can be no forfeiture until the full time has expired. If a claim is represented on the 30th day of December, 1877, such representation would save a forfeiture for that year, and would secure the party in his title until the 30th day of December, 1878, when the possibility of making representation for that year had expired. While the right of representation remains there can be no forfeiture, and so long as there is no forfeiture, the title of the person entitled to make representation is complete. The title only expires when the right to make representation is entirely gone.

Thornton having represented this ground in the spring of 1875, he or his grantee had the whole of the year 1876 in which to again represent it, and his rights thereto were not forfeited until the expiration of that year. It follows, therefore, that the location of the ground by plaintiff, on the 19th day of De-

cember, 1876, was made while yet the title of Thornton's grantee remained inviolate, and before there was any forfeiture of his right, whereby the claim became subject to relocation.

4. Thornton and his grantee having failed to represent the ground during the year 1876, did any rights thereby attach to the plaintiff by virtue of his location on the 19th day of December, 1876? And this leads us to an inquiry as to the nature and extent of the title of Thornton's grantee upon the day of the plaintiff's location.   What estate or interest does a person acquire by locating a mining claim according to law upon the public mineral lands, and holding possession thereof in pursuance of the law by properly representing the same from year to year?

The first section of the act of congress of May 10, 1872, declares all valuable mineral deposits in lands belonging to the United States to be free and open to exploration and purchase by citizens of the United States, and those who have declared their intention to become such, under the rules prescribed by law, and according to the local customs or rules of the miners not in conflict therewith.   The act defines the extent or quantity of the public lands that one person may occupy and hold as a mining claim, and section 3 provides: "That the locators of all mining locations heretofore made or which shall hereafter be made on any mineral vein, lode or ledge, situate on the public domain, their heirs and assigns, where no adverse claim exists at the passage of this act, so long as they comply with the laws of the United States, and the State, Territorial and local regulations not in conflict with said laws of the United States governing their possessory title, shall have the exclusive right to possession and enjoyment of all surface ground included within the lines of their location, and of all veins, lodes and ledges throughout their entire depth, etc."

By the terms of this section the locator of a mining claim has a possessory title thereto, and the right to the exclusive possession and enjoyment thereof.   These words imply property.   The right to the exclusive possession and enjoyment of a mining claim includes the right to work it, to extract the mineral therefrom, to the exclusive property in such mineral

and the right to defend such possession. The right to the exclusive possession and enjoyment of property, accompanied with the right to acquire the absolute title thereto, presupposes a grant, and the instrument of this grant, as applied to mining claims upon the public lands, is the act of congress above referred to. This act being of general application to all the mineral lands belonging to the government, and conferring a title or easement therein upon the locator thereof, and vesting the right in him to become the absolute owner to the exclusion of all others, is a legislative grant, and being given by act of congress is equivalent to a patent from the United States to the same. The title thus conferred upon the locator of a mining claim is a legal title as distinguished from an equitable one, and such a title as would support an action in ejectment.

In construing a section of the act of congress of July 26, 1866, which gave the right to the citizens to explore and occupy the mineral lands of the public domain, subject to the law and the local rules and regulations, this court, in the case of *Robertson* v. *Smith*, 1 Mont. 414, used the following language: "We hold that this section of the act grants to the proper person an easement upon such of the mineral lands belonging to the public domain of the United States as he may appropriate in accordance with the local rules and customs of miners in the mining district in which the same may be situated."

On page 416, same case, the following: "These rules and customs refer to the location, user and forfeiture of mining claims. When a miner locates a particular portion of mining lands in accordance with the rules and customs, then the grant from the general government to occupy, explore and take therefrom the precious metals, accrues to such miner over the ground located. The effect of this statute then is to grant these rights over the ground located in accordance with such rules, to as full an extent as if the land had been designated in the law."

If this were true under the act of 1866, the principle applies with stronger force to the act of 1872, which, in addition to giving the right to occupy and explore, gave also the right of exclusive possession and enjoyment to the locator, his heirs and assigns.

The supreme court of the United States, in the case of *Forbes* v. *Gracey*, 94 U. S. 767, speaking of mining claims while held by possessory title and before a patent has been obtained, by MILLER, J., says : "These claims are the subject of bargain and sale, and constitute very largely the wealth of the Pacific coast States. They are property in the fullest sense of the word, and their ownership, transfer, and use are governed by a well-defined code or codes of law, and are recognized by the States and the Federal government. These claims may be sold, transferred, mortgaged and inherited without infringing the title of the United States."

This is the kind of property that Humphrey and Allison, by their location, and their grantees by purchase, became possessed of in the mining claim in question, property capable of being bought and sold, mortgaged or inherited, and property that the act of 1872 granted to the locators of mining claims and their grantees, clothing them with the exclusive possession and enjoyment thereof. The government by its grant had conferred this property upon the grantors of Murphy, who became the owner on the 28th day of January, 1876, while yet the grant was effectual and in full force by virtue of the representation of the ground by Thornton in the spring of 1875, which representation of the ground prevented any forfeiture thereof until the first day of January, 1877.

The government having made this grant to these parties there was no room for a like grant of the same property to the plaintiff. The location of Humphrey and Allison being still alive on the 19th day of December, 1876, the date of plaintiff's location, the property on that day was not subject to location by the plaintiff. His location therefore was void, and his right to claim a grant from the government, depending wholly upon the validity of his location, it follows, therefore, that he acquired no interest in or right to the property. And the fact that eleven days subsequent to plaintiff's location the ground became forfeited by reason of the failure of Thornton and Murphy to represent the same, would not revive a void location or confer any rights upon the plaintiff. There is no grant from the government, under the

act of congress unless there is a location according to the law and the local rules and regulations. Such location is a condition precedent to the grant. Mere possession not based upon a valid location, would not prevent a valid location under the law. The plaintiff resting his sole right to the possession of the property upon his location of December 19, 1876, and that location being void, for the reason that the ground was not subject to location, and for the further reason that the government at that time had no possessory title to grant therein, having bestowed the same upon the grantees of Humphrey and Allison, ·the demand of the plaintiff to be restored to the possession of the property must fail, and the possession of the defendants having been acquired by virtue of their location in 1877, after this title of Thornton and Murphy had become forfeited by their failure to represent the ground in 1876, must prevail. The title of Murphy was not extinguished until January, 1877, though his right of action may have been barred by the Statute of Limitation, but as it is not necessary in this case, we make no decision upon this point.

As to the testimony of McFarland in relation to the amount of work performed upon the claims in dispute, it does not appear that he knew the lines of the claim himself, or that the man who told him knew the lines, and there was no offer to prove that this person who informed McFarland knew the lines of the claims. Under such circumstances there was no error in rejecting the testimony of McFarland as to the amount of work upon the claims for the reason that the witness had no means of knowing whether the work he saw was or not on the claims in dispute.

This view of the case renders it unnecessary for us to further pass upon the exception of plaintiff as to the testimony of McFarland on the question raised by the admission of testimony on behalf of the defendants as to the amount of labor performed by them on the claims after their location thereof.

Judgment affirmed with costs.

*Judgment affirmed.*