[Civ. No. 1111.   Third Appellate District.—October 1, 1913.]

## HENRI GOBERT, Appellant, v. F. L. BUTTERFIELD et al., Respondents.

MINES AND MINERALS—LOCATOR OR DISCOVERER—RIGHT TO PROTECTION FROM INTRUSION.—A locator of a mining claim cannot be deprived of his inchoate rights by the tortious acts of others; nor can an intruder and trespasser initiate any rights which will defeat those of a prior discoverer.

ID.—AMENDMENT OF NOTICE OF LOCATION—DOCTRINE OF RELATION.—Where the object of amending the notice of a location of a mining claim is to cure obvious defects, and there is no attempt to include new ground, the amended certificate will relate back to the original, notwithstanding intervening locations.

ID.—EXCESSIVE LOCATION—HOW FAR VOIDABLE.—A location of a mining claim in excess of the statutory limit, where it injures no one when made, if made in good faith, is voidable only as to the excess.

ID.—AMENDMENT OF LOCATION—RIGHT TO MAKE.—A locator of a mining claim may amend his location, if it can be done without prejudice to the rights of others.

ID.—MARKING OF BOUNDARIES—EFFECT OF SUBSEQUENT OBLITERATION.—Where a mining claim is once sufficiently marked on the ground, and all necessary acts of location are performed, a right vests in the locator, which cannot be divested by the subsequent obliteration of the marks or removal of the stakes without his fault. If the evidence shows that the boundaries were originally marked, the fact that the stakes then set cannot in later years be found, raises no presumption against the validity of the original marking.

23 Cal. App.—1       (1)

ID.—TIME FOR MARKING CLAIM.—A claim may be marked at any time prior to the acquisition of an intervening right, regardless of the question as to whether the time within which such marking was made is reasonable or not.

ID.—ACTION TO DETERMINE TITLE—CONFLICTING BOUNDARIES.—In this action to determine title to a quartz mining claim the evidence was sufficient to justify the trial court in concluding that the plaintiff had no intention originally of claiming any ground beyond the disputed boundary line, and that his object in amending his location was to take advantage of a discovery made by one who had already in good faith located the ground.

APPEAL from a judgment of the Superior Court of Plumas County.   J. O. Moncur, Judge.

The facts are stated in the opinion of the court.

L. N. Peter, for Appellant.

H. B. Wolfe, for Respondents.

CHIPMAN, P. J.—Plaintiff brings the action to determine his title to a certain quartz mining claim situated in Plumas County, and alleging, among other things, that defendants had wrongfully entered upon said claim and were removing ore therefrom, and praying for an injunction to prevent the said trespass.   Defendants denied plaintiff's ownership and claimed ownership in defendant Butterfield.   The controversy relates to a triangular parcel of land situated at the easterly end of the so-called Old Harry Quartz claim, herein referred to as the Old Harry, claimed by plaintiff, and the westerly end of the so called Old Harry Extension quartz claim, hereinafter referred to as the Old Harry Extension, claimed by defendant Butterfield and under lease to defendants Shinn and Smith.   The ownership of the respective claims as alleged in the pleading is not disputed except as to the small piece of land in controversy, and the question here concerns only the location of the boundary line between the two claims.   This triangular piece of land is 248.7 feet wide at the northerly boundary line of the two claims, and tapers close to a common point marking the southeasterly corner of plaintiff's claim and the southwesterly corner of defendants' claim.

The court found that defendant Butterfield is the owner of the disputed land and defendants Shinn and Smith lessees

thereof with an option to purchase. The restraining order was accordingly discharged and judgment passed for defendants. Plaintiff appeals from the judgment and brings here the judgment-roll and a duly certified transcript of the proceedings at the trial.

A motion was made by plaintiff to have the cause submitted on briefs on file, under rules II and V, [160 Cal. xlii, xlvi, 119 Pac. ix, x], because of respondents' failure to file their reply brief in time. Respondents made no appearance at the hearing of the motion and have filed no brief. The cause was submitted for decision in accordance with said motion.

It appeared that, on December 11, 1899, plaintiff posted on his claim a preliminary notice and, on July 11, 1900, his final notice of location. These notices stated that the land was in Plumas township, Plumas County, on surveyed land of the United States, "and particularly described as follows: Beginning 700 ft. east of notice posted at point of discovery and running westerly 1500 ft. together with 300 ft. of surface ground on each side of the lode or vein. The exterior boundaries are definitely marked so as to be readily traced." On July 31, 1912, plaintiff posted an "amended notice of quartz location" in which his former location was extended easterly to definitely include the disputed piece of land and he declared in his notice that it was "for the purpose of amending" the said preliminary and final notices of 1899 and 1900.

On August 10, 1912, he posted another amended notice of location in which he declared his purpose to be to amend his preliminary and final notices of said claims made in 1899 and 1900, and also to amend his amended location posted on July 31, 1912. Plaintiff's amended complaint describes his claim so as definitely to include the disputed land.

Defendants introduced evidence of the location of the Old Harry Extension posted on the claim January 1, 1912, by Robert McAuley; also a quitclaim deed by McAuley of said mining claim to F. L. Butterfield, dated July 16, 1912; also a notice of location by Butterfield which declared that it "was for the purpose of amending and perfecting the description of the Old Harry Extension quartz claim, the notice of the location of which is recorded in vol. 10 of Quartz Claims, Plumas Co. records," the notice of location posted and recorded

by McAuley. This amended location was posted on the claim August 2, 1912.

Plaintiff's amended location and the McAuley location and Butterfield's location embraced the disputed land.

Appellant states certain propositions which may not be controverted: That a locator cannot be deprived of his inchoate rights by the tortious acts of others; nor can an intruder and trespasser initiate any rights which will defeat those of a prior discoverer (*Ehrhardt v. Boaro,* 113 U. S. 527, [28 L. Ed. 1113, 5 Sup. Ct. Rep. 560]); that where the object is to cure obvious defects, and there is no attempt to include new ground, the amended certificate will relate back to the original, notwithstanding intervening locations (Lindley on Mines, p. 719); that a location in excess of the statutory limit, where it injures no one when made, if made in good faith, is voidable only as to the excess (Lindley on Mines, p. 664); that a locator may amend his location, if it can be done without prejudice to the rights of others (Id. 984); that where the claim is once sufficiently marked on the ground, and all necessary acts of location are performed, a right vests in the locator, which cannot be divested by the subsequent obliteration of the marks or removal of the stakes without the fault of the locator. If the evidence shows that the boundaries were originally marked, the fact that the stakes then set could not in later years be found raises no presumption against the validity of the original marking (Id. 691, 692); that a claim may be marked at any time prior to the acquisition of an intervening right, regardless of the question as to whether the time within which such marking was made is reasonable or not (Id. pp. 597, 679).

The case turns largely on the fact whether the plaintiff originally placed a stake at the point now claimed as his northeast corner, being the point at which he placed a stake when he surveyed and posted his amended location, in 1912, and whether he claimed originally his easterly end boundary to be on a line leading from said northeast corner to the point originally and now claimed to be his southeast corner, which is substantially Butterfield's southwest corner. Plaintiff was the only witness to his having placed a stake for his northeast corner at the point above referred to. He testified that it was the same as the stake at the other corners; that it was pulled

up and thrown away about two or three months later and he never replaced it for the reason, as he testified: "I got a witness tree marked; I think the witness tree show my post was there." He testified that he marked the lines by blazing the trees between the corners, and that these blazed trees plainly marked his line and were as near to it as he could find them. He testified that, without compass or chain, he stepped off the distances from corner to corner, commencing at the southwest corner of his claim and endeavored to mark out a piece of ground whose sides were of equal length and the ends parallel, as near as he could. When his survey was made, it appeared that his north boundary line, as he then claimed it, was about one hundred and sixty feet longer than his south boundary line, while the two end lines were within a few feet of the same length. His explanation of the difference between the north and south lines was shown not to be satisfactory. Witness Barbee, who surveyed plaintiff's claim, commencing August 22, 1912, testified that he located the corners and lines under plaintiff's direction, he himself having no knowledge of them except as imparted by plaintiff; that he found no corner at the point claimed as plaintiff's northeast corner, but found the other corners. He was asked, on cross-examination: "Q. Was there any evidence of a stake or mound of rock at or near this place you established as the northeast corner? A. No, sir." Of the blazed tree he found eight or nine feet from where he placed the corner; he testified that it was blazed on the east and west sides and not on the north; that it was not blazed as he would have blazed it to mark a corner; that he would not have taken it for a corner tree, but as a line tree, and that plaintiff "did not claim that was a corner." He testified that he found blazed trees along the boundary lines which plaintiff pointed out as having been marked by him as boundary trees. Witness Barbee also testified that he noted but one blazed tree between the original northeast corner and the northeast corner established in this survey of April, 1912, a distance of 278.5 feet as shown by defendants' plat, exhibit "B." There was evidence that there were a good many trees along that line which might well have been marked as line trees if a line had been run there. Witness Barbee also testified that he saw no evidence of any work or mining done on plaintiff's claim east of the line now

claimed as Butterfield's west boundary line except the work in the shaft being done by defendants at the time Barbee made his survey. He found and located on his plat the tunnels, drifts, and shafts, and other workings done by plaintiff since he located the claim in 1900. Barbee also testified that he found no center end stakes of plaintiff's claim, and no center or lode line blazed.

Surveyor Watson was a witness for defendants and made a plat (defendants' exhibit "D") showing in red lines the survey made by Barbee and in black lines the survey of the Butterfield claim by Surveyor Cameron made in June, 1912, as located by McAuley in January, 1912. He found no evidence of any workings east of the west line of the Old Harry Extension (the Butterfield or McAuley claim) except the shaft called the Butterfield shaft, the work of defendants. He testified that the distance between Butterfield's west end center and plaintiff's new east end center was one hundred and twenty feet.

On October 1, 1910, plaintiff leased to Charles Grill and Robert McAuley a certain parcel of the Old Harry claim for the period of eighteen months from the date of the lease, "to mine and stope and extract all ores, together with all ground extending from the east end line of the said 'Old Harry' claim along the course of said vein six hundred (600) feet." Witness Grill testified that they worked under the lease about 17 months, to about April 1, 1912; that other lessors were there in June, 1911, and it became necessary to mark out the land included in his lease; that plaintiff and Grill and McAuley did this at that time. He testified that they "started at a tree Mr. Gobert said was his east end line or very near his east end line, and measured 600 feet to a cedar tree and marked the cedar tree." He testified that he had, recently, in company with Mr. Butterfield, found the tree indicated at the east end line and also the cedar tree. He was asked what he used to measure the ground at first, and answered: "A 75 foot tape; Mr. McAuley carried the front end of the tape, Gobert and I brought up the rear. I stayed with Gobert." There was a certain ravine at the west end that he testified Gobert did not want them to go beyond. He testified that in his recent measurement "he used a 100 foot tape," and that they had no difficulty in finding the tree shown him as marking plaintiff's

east end line—the line now claimed by defendants as the west end of the Old Harry Extension. Witness Butterfield gave similar testimony as to this six hundred feet measurement. He was present in June, 1912, when Cameron surveyed the Old Harry Extension. He testified that plaintiff was there at the same time; that, in a conversation with plaintiff, witness told him that "the boundary lines between the two claims was being surveyed out"; that he heard surveyor Cameron tell him the same thing; that while Gobert was there the west end center of the Old Harry Extension was established and posts completed; that he was familiar with the ground since 1899 and never saw a stake or evidence of any corner at the point now claimed by plaintiff to be his northeast corner. He testified that he assisted Cameron in his survey of the Old Harry Extension and establishing the west end line; that they started at the cedar tree mentioned by Grill and ran six hundred feet to the yellow pine tree also mentioned by him and took that as the starting point or as marking the west end line of the Old Harry Extension. At this time shaft No. 1, marked on Barbee's plat, had been dug about thirty feet and ore had been discovered. Defendants Shinn and Grill were working there at that time under a lease and "continued until stopped by order of this court"; that they were working there when plaintiff had his survey made by Barbee; that all the corners and the west and east end centers were established and postmarked by the Cameron survey in June, 1912. He also testified that he assisted Grill in posting the McAuley notice.

Witness Shinn testified to his having assisted in putting down what is called shaft No. 1, and that it is thirty or thirty-three feet east of the west end of the Old Harry Extension; that he worked there from the 25th day of June, 1912, until in August when stopped by injunction; that except their work there were no workings or discovery of ore east of that line. He testified that he assisted Cameron in making his survey on June 27, 1912; that plaintiff "came there while we were surveying. Q. What did he do while he was there? A. Stood there with his eyes wide open to see what he could see. Q. Did he follow along the line? A. Very close, yes, sir. Q. Do you know whether or not he was at the west end center of the Old Harry Extension? A. He was in sight of it." He testified that plaintiff asked what they were doing

and Cameron told him they were "running a boundary line"; that the west end center of the Old Harry Extension claim "was either established or being established at the time he (plaintiff) was there"; that witness was then working on this claim and continued to do so until stopped by order of court. He testified that he had been at the point claimed by plaintiff as his northeast corner, both before and since the Barbee survey and he saw no evidence of an old corner, no evidence of a mound of rock, or stake, or corner. He testified that at the time the west end of the Old Harry Extension was being surveyed plaintiff "did not make any claim as to being the owner of this ground where work was being done"; that the first time he made any claim to it was on the twenty-second day of July, 1912. Defendant Smith was also present in June when the Cameron survey was made. He testified that plaintiff asked him what they were doing and he told him "they were running a boundary line"; that plaintiff "was there when the west end center was set up" of the Old Harry Extension; that plaintiff was living near the property. It appeared that after the location of the Old Harry Extension claim in January, 1912, the lines were not run out and marked until in June, 1912, at the time of the Cameron survey, but the evidence was that the survey embraced the land included in the location by McAuley. A copy of McAuley's location notice was introduced in evidence, marked exhibit "A" but, for some unexplained reason, is not in the transcript. There were some further facts and circumstances made to appear tending to confirm what, it seems to us, is sufficiently shown by the facts above given—that plaintiff's original location did not include and was not intended to include the land in dispute. For twelve years he had been working his claim and put down several shafts, had run two or three tunnels of some extent, on different parts of his claim, and one shaft was quite near to the disputed boundary, but in all this time he had not apparently made any claim further east nor had he prospected or done any work further east. As late as in 1910 he leased the east six hundred feet of the claim and in 1911 he designated the location of his east boundary line and this was the line claimed by McAuley as his west line. In June, 1912, when Cameron was surveying the McAuley location, plaintiff was present, saw and was told what was being

done. At that time a shaft had been dug on the McAuley claim and work was being done on it. He saw this but made no claim that it was on his location. It was not until the latter part of July that he asserted any right to this land and then it was he posted and filed his notice of amended location. He explained his silence by testifying that he thought the lines were being run and the work done by a company that held an option on his property then about to expire. It was shown that this company had applied for an extension of time on their option and was refused and that the company had ceased work some time before. The facts brought out were such as to have warranted the trial court in rejecting this explanation as accounting for plaintiff's silence when he learned that the disputed land was claimed by another.

The rules of law invoked by plaintiff were established to meet the conditions under which prospectors and mineral locators often find themselves in making their locations and are just and salutary and are in the interest of honest effort to develop the mineral resources of the country. Turning back to these rules, can it be said, in the face of the evidence which the learned trial judge presumably accepted as true, and so must we, that the defendants' acts were tortious and an intrusion upon plaintiff's rights as a prior discoverer? Can it be said that his amended location was to cure obvious defects in his original location; that his amended claim was without prejudice to the rights of others; that there were no intervening rights when he extended his claim so as to include the ground located by McAuley and on which McAuley's grantee was working when this extended claim was being marked out? The answers must be in the negative. It is true that McAuley was plaintiff's tenant at the time McAuley located his claim, but he and his partner, Grill, had been shown the eastern boundary of plaintiff's claim by plaintiff himself after more than ten years of possession and it was nearly a year thereafter that McAuley made his location. There is no evidence of bad faith on McAuley's part or that plaintiff was deceived or lulled into a feeling of security by him or any one else.

The evidence was conflicting but we think there was sufficient evidence to justify the trial court in concluding that plaintiff had no intention originally of claiming any ground

beyond the disputed boundary line and that his object in amending his location was to take advantage of a discovery made by one who had already in good faith located the ground. We do not doubt that had there been no intervening rights plaintiff could have lawfully done what he attempted to do. The rules relied upon by him, and as we had occasion to consider them in *Madera and Western Carbonic Acid Co.* v. *Sonoma Magnesite Co.*, 20 Cal. App. 719, [130 Pac. 175], so declare. But, unfortunately for him, he failed to do these acts which these rules presuppose have been done in order to protect him in his assumed rights.

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.