J. F. NICHOLS, MYRTLE B. SPOR, ESTELLE PACK, RAY V. MIKESELL, GLADYS SMITH AND BEATRICE POWELL, APPELLANTS, *v.* ORA TAHOMA MINING COMPANY (SOMETIMES KNOWN AS INDIANEEN MINING COMPANY, A CORPORATION), AND FRED G. BERTO, TRUSTEE IN BANKRUPTCY OF INDIANEEN MINES, INC., A CORPORATION (SUBSTITUTED FOR INDIANEEN MINES, INC.), RESPONDENTS.

SAME, APPELLANTS, *v.* A. F. W. CARLSON, JOHN DOE, RICHARD DOE, THE BLACK COMPANY AND THE WHITE COMPANY, RESPONDENTS.

No. 3390

August 30, 1944.                    151 P. (2d) 615.

*Thatcher & Woodburn,* of Reno, and *William Crowell,* of Tonopah, for Appellants.

*Walter Rowson,* of Reno, for Respondents.

## OPINION

By the Court, TABER, J.:

In August, 1922, Nichols, Mikesell and Dennison located the Albert and Albert No. 1 lode mining claims in the Oneota Mining District, Esmeralda County, Nevada. In September, 1923, in the same mining district and county, they located two additional lode mining claims, the Albert No. 2 and Albert No. 3. The interest of Dennison in said four claims was subsequently, and before November 27, 1934, acquired by Nichols and Mikesell who, on the last-mentioned date, granted a lease and option on all the claims to one Zent. By this instrument Zent was required to do certain work on the property, and the purchase price was fixed at $30,000, to be paid within three years. On June 3, 1935, Zent assigned said lease and option agreement to Ora Tahoma Mining Company.

In November, 1935, Fred G. Berto, then president of Ora Tahoma Mining Company, and Otto Hanson, a representative and vice president thereof, located the Berto, Bennett, Edith Hild and Otto Hanson lode mining claims in said mining district and county. Indianeen Mines, Inc. has succeeded to all the rights of Berto and Hanson in these claims. For the purposes of the present litigation the respective rights and obligations of Indianeen Mines, Inc., and Ora Tahoma Mining Company are identical.

The company failed to comply with the provisions

of the lease and option agreement of November 27, 1934. After defaulting it entered into a new agreement with Nichols and Mikesell, dated February 12, 1938. This agreement granted a further lease and option upon said four claims in the Albert group and nine other claims. The company was given until January 31, 1940, to purchase all said claims for $45,000. A number of payments were made under this contract, but the company defaulted in the $3,000 payment due in September, 1939. On the 28th of November following, the company was notified that the agreement would be canceled if the required payment was not made within thirty days. The money was not paid within that time, and a further notice of default was given January 8, 1940. Responding to this notice the president of the company, on January 12, 1940, wrote to Mr. Nichols in part as follows:

"This is to acknowledge your formal notice of cancellation dated January 8, 1940. We are sorry that we were unable to keep up this contract  *  *  *  if you do not immediately dispose of your property it may be that we can get together a little later on  *  *  * you have always been most fair to us, we just were being a little too optimistic  *  *  *."

Notwithstanding said notice of cancellation and the reply thereto, possession of the Albert group has never been delivered to the owners.

On April 22, 1940, plaintiffs' attorney wrote a letter to the president of the company advising that:

"Your agents have not fully removed from the property but still remain on that part of the property located as claim Albert No. 3, which Mr. Carlson is attempting to hold under some claim of right."

Mr. Carlson was general superintendent for the company. Plaintiffs' attorney again wrote the company's president on May 8th, 1940, saying:

"Under date of April 22nd, 1940, I wrote you regarding certain claims in Queen Canyon in Esmeralda and

Mineral counties, Nevada. I have been advised that your company is continuing to work thereon under claim of right and unless your company immediately withdraws therefrom it will be necessary to take legal action to clear the ground."

To this letter Mr. Reed, president of the Indianeen company replied on May 8, 1940, as follows:

"Your letter of May 8th in which you refer to your letter of April 22nd received. To this letter we replied direct to Mr. Nichols and since have heard nothing from him.

"To us your letter does not quite make sense. Three days ago we received a letter from Mr. Carlson, our superintendent at the time, in which he tells us that Mrs. Spor, eldest daughter of the late Mr. Mikesell, and Mr. Nichols were up to see him a few weeks ago. At that time it was agreed between the three of them that in return for our doing their assessment work, they would permit us to leave our cabins on their property and continue on as we have been doing for a payment to them of $1.00 a year. In view of this agreement, and as we have had no notice of its revocation, we feel that there must be some misunderstanding, as we cannot reconcile your letter with the information we have from Mr. Carlson, and which he sent us after we wrote and told him of receiving your letter of April 22nd.

"Will you kindly contact Mr. Nichols and get this straightened out."

One June 9, 1940, mine surveyor Liddell went upon the Albert claims and surveyed them for plaintiffs, remaining on the ground until the evening of June 13. He informed plaintiffs that the Albert claims were of greater length than permitted by law, and advised they be amended. This course was decided upon, and before leaving the claims on June 13, Liddell fixed the points for placing new posts to mark the boundaries of the claims as amended. New boundary posts for the Albert No. 3 were erected before he left the property on June

13. The boundary posts for the other three claims were erected after he had left the ground, and amended certificates of location for all four claims, dated June 13, 1940, were filed for record July 29, 1940.

While engaged in making his survey, Mr. Liddell told respondent Carlson that he, Liddell, was making a survey of the Albert claims. On June 14, the next day after the Liddell survey was completed, Mr. Carlson located the Arthur lode mining claim, and on August 20 following, he also located the Arthur No. 1. When these two claims were located he was general superintendent for the company, and it is stipulated that any rights he may have acquired by said locations were held in trust for it. Much of the ground covered by the amended Albert Claims is included in that covered by defendants' claims. Any interest there may be in the Albert claims is now owned by appellants; any interest there may be in the Berto, Bennett, Edith Hild, Otto Hanson, Arthur and Arthur No. 1 claims is now the property of the respondents.

Two actions were commenced by plaintiffs in the Fifth judicial district court, county of Esmeralda, one (No. 4109) against the company, and the other (No. 4113) against A. F. W. Carlson et al. These actions were commenced, respectively, on June 18 and October 15, 1940. In each action the plaintiffs prayed that they be adjudged the owners of the Albert claims, that the defendants be adjudged to have no interest in said claims, or in any part thereof, and that they be forever debarred from asserting any claim in or to said claims or any portion thereof adverse to the plaintiffs. The answers denied most of the allegations of the complaints, and prayed that plaintiffs' complaints be dismissed. In case No. 4109 defendant company alleged that it owned certain mining claims in the Queen Canyon Mining District, Esmeralda County, and that said claims were not being held adversely to plaintiffs. In case No. 4113 the answering defendant Carlson

alleged that he and his associates, and corporations represented by him, claimed an interest in the Bennett, Arthur, Arthur No. 1, Berto, Edith Hild and Otto Hanson claims, and that said interest was secured by mining locations duly made, completed and recorded; also that plaintiffs had no right, title or interest in said claims. Besides asking that plaintiffs' complaint be dismissed, Carlson further prayed judgment decreeing ownership of said six claims to be in him and his associates, and that plaintiffs be forever debarred from asserting any interest in said claims or any portion thereof adverse to him.

The two actions were consolidated for purposes of trial. A stipulation entered into by the parties at the beginning of the trial included the following: "That in making said several locations of the defendants, to-wit: Berto, Bennett, Edith Hild, Otto Hanson, Arthur and Arthur No. 1 lode mining claims and the said several locations of the plaintiffs, to-wit: the Albert, the Albert No. 1, the Albert No. 2, and the Albert No. 3, the requirements of Federal and State law were complied with by the respective locators in the following particulars: (1) That notices of location were properly posted upon the ground. (2) That a discovery of valuable mineral was made upon each of said locations. (3) That the requisite location monuments and markings were placed upon the ground. (4) That the discovery or location work upon each of said locations was properly done within the time required by law."

Some time after district court action No. 4109 was commenced, another party defendant was added, and for convenience we shall from now on usually speak of the "defendants," rather than of the "defendant."

The four Albert claims, as amended, occupy the same relative positions with respect to one another as when they were originally located. The Albert No. 1 adjoins the Albert on the east, while the Albert No. 2 adjoins the Albert on the west. The Albert No. 3 is contiguous

to the Albert on the south, but is not contiguous to either the Albert No. 1 or the Albert No. 2. The southerly end center of the Albert is also the northerly end center of the Albert No. 3. The northwesterly corner of the Albert No. 3 is also the southwesterly corner of the Albert and the southeasterly corner of the Albert No. 2. The northeasterly corner of the Albert No. 3 is also the southeasterly corner of the Albert, and the southwesterly corner of the Albert No. 1.

Two maps were received in evidence at the trial, one (Plaintiffs' Ex. No. 25) prepared by surveyor Liddell, the other (Defendants' Ex. H) by surveyor Giles. The Liddell map purports to show the Albert group as amended, together with the positions of a number of the original monuments as established by the trial court in its findings. The Giles map shows (1) the positions of respondents' six claims as claimed by defendants; (2) the Albert claims as defendants contended they were originally located; (3) the Albert claims as respondents contend they were attempted to be swung by the allegedly void amended locations.

In its findings the trial court definitely established the positions of a number of the original monuments of the Albert group. These are shown on the Liddell map, and are as follows: Northwest corner of Albert No. 2; northeast corner of Albert No. 2, which is also the northwest corner of the Albert; northeast corner of Albert, which is also the northwest corner of the Albert No. 1; north end center of Albert No. 1; northeast corner of Albert No. 1; southeast corner of Albert No. 1; southwest corner of Albert No. 2, now obliterated; southeast corner of Albert No. 3; south end center of Albert No. 3; north end center of Albert No. 3, which is also the south end center of the Albert; and the location monument of the Albert No. 2.

The court further found: That the southwest corner of the Albert No. 3 was originally located in the general vicinity indicated as the northwest corner of the Arthur

No. 1 claim on defendant's Ex. H; that the original location monument of the Albert, now obliterated, was located in the general vicinity as indicated on plaintiffs' Ex. 25; that the original location monument of the Albert No. 1, now obliterated, was located in the general vicinity as indicated on plaintiffs' Ex. 25; that the original location monument of the Albert No. 3 was placed upon said claim at a point in the general vicinity of 100 feet northeast of a place where an office building now stands upon said claim.

Finding XIX reads as follows: "That the plaintiffs' alleged Albert, Albert No. 1, Albert No. 2 and Albert No. 3 mining claims, so amended on the ground, are within the exterior boundaries of said claims as originally marked upon the ground."

In its conclusions of law the court found that the amended location of the Albert No. 2 was valid, but that the amended locations of the Albert, Albert No. 1 and Albert No. 3 were void. It further found that all of defendants' claims were valid, except the portions of the Bennett and Berto which conflict with the Albert No. 2. It quieted plaintiffs' title to the Albert No. 2, and defendants' title to the six locations claimed by them except insofar as the Berto and Bennett claims conflict with the Albert No. 2. By the decree defendants were debarred forever from claiming any interest in the Albert No. 2, and plaintiffs from claiming any interest in the six locations claimed by defendants, except such parts of the Berto and Bennett claims as are in conflict with the Albert No. 2. This appeal is from the portion of the judgment adverse to plaintiffs and from the order overruling their motion for a new trial.

Appellants contend that the Albert claims have been valid subsisting locations ever since they were originally located, and that defendants' claims, having been located subsequently, are therefore void insofar as they conflict with the Albert group. They further claim that

defendants are estopped to deny plaintiffs' title, because of the rule that a tenant is estopped to deny the title of his landlord.

One of the contentions urged by respondents is that plaintiffs, by means of their purported amended locations, attempted to so swing the Albert claims as to embrace certain areas which were not included within the original locations, but were within the boundaries of the claims located by defendants on open public domain. They further contend that the evidence fails to establish plaintiffs' title to the areas embraced in the Albert locations. They assert that appellants have wholly failed to establish what areas were originally segregated from the public domain by their location of the Albert group. They maintain that when defendants' claims were located, it was impossible for any person to definitely ascertain the location of plaintiffs' claims, either by competent documentary evidence or competent evidence of physical indicia on the ground by way of monuments and markings. By reason of this alleged lack of sufficient notices, records, markings or monuments, respondents contend that when defendants located their claims the ground covered by the Albert locations had become open public domain, subject to new locations. It is not contended that plaintiffs' forfeited their claims because of any failure to perform annual labor.

■ In amending a location the claim may be swung if no intervening rights of third parties are infringed. Duncan v. Fulton, 15 Colo. App. 140, 61 P. 244. But respondents, as we have seen, contend that their rights had intervened before plaintiffs attempted to amend their locations.

The lower court did not find, nor at any time express the view, that plaintiffs by their amendments were attempting to swing the Albert claims. Its decision was based upon an entirely different ground. But if the evidence shows that in amending their locations plaintiffs did swing their claims as claimed by respondents,

then the judgment, they say, should be affirmed notwithstanding it might actually have been based upon another and erroneous concept or theory.

To support their contention with respect to the swinging of the Albert claims, respondents rely chiefly on the testimony of their surveyor, E. S. Giles. Mr. Giles was the only witness who testified at the trial in behalf of the defendants. Respondents explain this by saying that between August 31, 1941, when plaintiffs rested their case, and March 3, 1942, when the trial was resumed, the respective parties had been unsuccessfully negotiating for a compromise settlement; that during this period the war commenced, and all defendants' witnesses who had been in attendance in August, 1941, except Mr. Giles, went away, either to enter the service or engage in industry essential to the war, and so were not available when the trial was resumed. Regrettable as this may be, the court must determine the issues on the record as it comes before us. Respondents of course realize this, but they insist nevertheless that the judgment should be affirmed, not only on the basis of Mr. Giles's testimony, but also because of the alleged failure of plaintiffs' own proof.

The Giles map shows each of respondents' claims, except the Arthur and Arthur No. 1, as being contiguous to one or more of appellants' claims as the latter were originally located. According to this map, none of respondents' claims conflicts with any of appellants' claims as the latter were originally located; but it shows a conflict of every one of respondents' six claims with a part or parts of one or more of the Albert group as amended.

All of appellants' claims, as respondents contend they were originally located, and all of respondents' claims except the Otto Hanson, are shown on the Giles map as running northerly and southerly; the Otto Hanson is shown as running easterly and westerly. In the original location notices of the Albert claims each claim was described as running in a northerly and southerly

direction, and the general course of the vein was given in each case as northerly and southerly. In the amended certificates of location the survey descriptions show that the claims run northeasterly and southwesterly, but they are described in the earlier parts of said certificates as running northerly and southerly, and later therein the general course of the lodes is also given as northerly and southerly. On the Liddell map the Albert, Albert No. 1 and Albert No. 2 claims run north 19°48′ east, while the course of the Albert No. 3 is north 24°32′ east. According to the Giles map the Albert locations, as defendants claimed they were originally located, ran north 6°16′ west. As amended, the Albert, Albert No. 1 and Albert No. 2 are shown on that map to run approximately north 20°20′ east, and the Albert No. 3 about north 25° east. The Bennett, Berto and Edith Hild are shown on the same map as running north 6°16′ west; the Arthur and Arthur No. 1 north 6°40′ west. Also, on the Giles map, six veins are shown on amended Albert, Albert No. 2 and Albert No. 3 running about north 30° west. As shown, all these veins cross certain of the side lines of some of the amended Albert claims; none of them is shown as crossing the end line of any of said amended claims.

Mr. Giles testified that when he made his survey in October, 1940, he found the original location monument of the Albert No. 2; also a rock monument at the face of an open cut at a point where the location monument of the Albert should be. He testified that by running his lines from the northwest corner of the Albert and the northeast corner of the Albert No. 2, he found the discovery monument of a claim called the Valley View which had been located by plaintiff Nichols and his deceased partner, Mikesell, in 1925. In this discovery monument, says Mr. Giles, there was a notice of location dated August 1, 1925. Nichols and Mikesell were named as the locators. The notice described the Valley View claim as extending from the discovery monument

600 feet in a southerly direction and 800 feet in a northerly direction and 300 feet on each side of the middle of the vein "bounded on the south end by the north end of the Albert mining claim, with the general course of the vein or lode northerly and southerly"—the size of the claim being given as 1500 feet long and 600 feet wide. Mr. Giles further testified that he scaled the distance from the north end of the Albert, as claimed by appellants under their amended location, to the discovery monument on the Valley View, and found it to be 850 feet; also that the scaled distance from the discovery monument of the Valley View to the north end line of the Albert (as defendants claimed the latter was originally located) was 608 feet. According to his testimony he also located the original south end center of the Albert No. 3. "In regard to the Valley View location and the monument I found on the south end marked 'south end center of Valley View' I would say that it clearly defined the north end line of the Albert. The distance was approximately correct to establish that line to where the posts are now. In regard to the south end center of the Albert No. 3 it would indicate to me that the claim originally is where approximately, where we show it on the map." Testifying concerning a tunnel on the Albert No. 1, Mr. Giles said that if that claim was located originally as claimed by the amended location shown on the Giles map, the portal of the tunnel would be 50 feet outside the boundaries of the Albert No. 1. "Q. And for what difference would that tunnel or drift, the continuation of the tunnel be run outside the boundaries of the Albert claim in its course to the northwest? A. Over 200 feet." The purport of Mr. Giles's testimony, of which but a very small part has been mentioned, is that plaintiffs in amending the Albert claims swung them about 26°, and respondents intimate that the chief purpose in doing so was to unlawfully bring within the boundaries of the Albert No. 3 certain valuable improvements which had been placed upon the ground by defendants.

Mr. Giles had never been on the ground in dispute before 1940, and in that year he went upon the ground some time after Mr. Liddell had completed his survey. Some of the monuments found by him were posts marked "Survey 1935." These posts appear to have been monuments of a survey made in 1935 by a Mr. Greenwood, of Bishop, California. Mr. Giles testified that he had talked with Greenwood, but the latter was not called as a witness at the trial nor was his deposition taken by the defendants. With reference to the Greenwood survey the trial court, in its written decision, said: "In 1935, a survey on the land was made by one Greenwood, purporting to establish the boundary monuments of the Albert group as shown in unbroken lines on said Exhibits H and L. There is no evidence to show that the Greenwood survey was made at the instance of the owners of the Albert group or either of them or that it was adopted by them. No proofs were presented to show what, if any, monuments of the Albert claims were found upon the ground by the surveyor, Greenwood, as the basis of his survey. No location certificates were filed based upon such survey. The survey, therefore, affords no aid in solving the problems in this case."

In making his survey Mr. Giles depended considerably upon what was told him by Mr. Carlson, one of the respondents. Defendants' exhibit H is an enlarged copy of their exhibit L. In representing the position of the Albert No. 3 on Ex. L, Mr. Giles relied entirely on what was told him by Mr. Carlson. Mr. Carlson himself gave no testimony in the case.

Plaintiffs' witnesses were Mr. Nichols, one of the original locators of the Albert group, surveyor Liddell, and Messrs. Summerville, Sproule and Spor. The testimony of Mr. Liddell was based upon his survey made in June, 1940. The other four witnesses testified from alleged personal observation of marks and boundaries as they existed either at the time the Albert claims were

originally located, or at various times thereafter before they were amended. Nichols is the only one who testified from personal knowledge and recollection regarding the original boundaries and the positions of the original marks and monuments.

With respect to the Albert No. 3, Mr. Nichols, on a pencil sketch, showed the positions of a cabin, a spring, a graveyard and the discovery point of that claim. He testified also concerning the location of the south end center, the southeast corner, the southwest corner, and the north end center of said Albert No. 3.

Mr. Liddell testified as to the approximate positions of the discovery monuments of the Albert and Albert No. 1 as pointed out to him by Mr. Summerville. He also testified how he determined the positions of the discovery monuments of the Albert and Albert No. 1 from that of the discovery on Albert No. 2. He testified further that he established the discovery monument of the Albert No. 3 1,000 feet southerly from what was shown him as the north end center of that claim—said distance being that called for in the location notice. He testified regarding the southwest corner and the north end center of the Albert No. 3.

Summerville testified that he became acquainted with the Albert group in 1928, and that he pointed out to Mr. Liddell the approximate positions of the discovery monuments of the Albert and Albert No. 1. He also testified that in 1932, while in the employ of Mikesell (now deceased), he helped the latter straighten up some of the monuments on the Albert group which had been knocked down by sheep.

Sproule testified that he also, during the lifetime of Mikesell, helped him to rebuild some of the monuments on Albert No. 3 and the other claims; that he was on this ground in 1930, 1931 and 1932; that on one or more occasions he stayed with Mikesell, who at the time was living in the cabin near the spring; that in the spring of 1935, to the best of his recollection he helped

build a cookhouse while working for defendants; that he worked in the tunnel across the creek; that he knew two monuments on Albert No. 3, one south and one southeast of the cabin, and that Mikesell told him they were monuments of his claim; that the south end center of the Albert No. 3 now on the ground was there at that time, and that he pointed out this monument and the southeast corner of that claim to Mr. Liddell.

Spor testified that he found some monuments on the Albert claims when he visited that group for the first time in 1940.

■ It would unduly lengthen this opinion to further summarize the testimony of the various witnesses. The record shows that the trial court followed the testimony closely. After considering it and the documentary evidence, that court, as we have seen, established the positions of a number of the original marks and boundaries on the Albert claims, and found as a further fact that the amended Albert claims are within the exterior boundaries of said claims as originally marked upon the ground. After examining the maps and carefully considering said findings, it seems clear that if the latter are supported by the evidence there could not have been any such swinging of plaintiffs' claims as asserted by respondents. The Giles map (Ex. H.) shows the southwesterly end of the Albert No. 3 as having been swung more than 1,000 feet from its original position. This is inconsistent with the positions of the original southeast corner, southwest corner, south end center and north end center of that claim, as established by the findings. While there is a conflict in the evidence as to whether the Albert claims were swung as claimed by respondents, there is substantial evidence to support said findings, and not being clearly incorrect, they will not be set aside. It may be stated too that said findings show it is not true that none of respondents' claims conflicts with any of appellants' claims as the latter were originally located. We cannot

of course say whether the findings would have been different had defendants not lost most of their witnesses.

The trial court based its decision upon the ground that the areas covered by the original Albert locations (excepting only the Albert No. 2) subsequently became open public domain, subject to new locations, because of plaintiffs' failure to maintain sufficient monuments, notices or records to enable any one to determine the boundaries with substantial or reasonable certainty. "The federal law," says the court, "requires that the location shall be so marked upon the ground that its boundaries may be readily traced. Therefore, while one or more of the boundary monuments required under the state law may be obliterated without destroying the validity of the claim, yet there must remain sufficient markings of the location, upon the ground, by posted notice, reference to neighboring objects, or identifiable boundary monuments, that the location of the claim may be readily traced." Again the court says: "The court is in the same position as is the prospector on the ground, seeking to determine the position of a mining claim. The one is confronted with the physical facts, the other with the proof of those facts, the question being, as already stated, to determine what land has been segregated from the open, public domain." The court's decision was to the effect that when four of respondents' six claims were located in 1935, the ground covered by each was open public domain except those parts of the Bennett and Berto which are in conflict with the Albert No. 2. The court took the view that plaintiffs' attempted amendments of the Albert claims in 1940 were void, so that the ground covered by the Arthur claims was likewise open for location when those two claims were located on June 14 and October 20 of that year.

Respondents contend that appellants wholly failed to establish what areas were originally segregated from

the public domain by their location of the Albert group. The burden, according to respondents, was upon appellants to establish one or the other of the following two essential premises: "(a) If the calls and distances are not shown in posted notices or set out in their recorded notices of location with sufficient clarity to identify the claims, then and in the alternative, that the required statutory monuments, properly marked, were on the ground when respondents' locations were made; or (b) That in the absence of such monuments and appropriate markings, notices of location, or discovery notices, were actually posted and maintained on the ground at the time of such subsequent locations by respondents containing sufficient data by calls and distances to identify the segregated areas."

Respondents concede that the law does not require the perpetuation of monuments where the courses and distances are shown in posted notices, or set out in the recorded certificates of location with sufficient clarity to identify the claims; but they maintain that if the claims are not so identified in the posted notices or in the records, the monuments must be maintained on the ground, otherwise there would be no way to determine the boundaries of the claims.

It was the lower court's view, and respondents contend on this appeal, that the burden was upon plaintiffs to show that when defendants located their claims there were sufficient monuments, notices or records from which they could have determined the boundaries of the Albert claims. In the opinion of the district court this was satisfactorily shown with respect to the Albert No. 2, but not as to the other three Albert locations.

Appellants contend that the evidence afforded sufficient data to enable the trial court to determine, with substantial accuracy, what ground had been monumented and segregated from the public domain by the original Albert, Albert No. 1 and Albert No. 3 locations, as well as by the Albert No. 2. Let us assume, however,

in favor of respondents, that the trial court was right in holding that the data was insufficient with respect to all except the Albert No. 2. On that assumption, what would be the legal effect?

██ It is to be borne in mind that all the Albert claims, as originally located, were (except as to the excess areas) valid, properly monumented locations. The land covered by them could not be relocated by others unless and until some act or laches of the owners occurred by which the title reverted to the government. Slothower v. Hunter, 15 Wyo. 189, 88 P. 36, 39. The general rule is that when a location is once sufficiently marked on the surface so that its boundaries can be readily traced, and all other acts of location are performed as required by law, the right of possession is fully vested in the locator, and he cannot be divested of this right by the removal or obliteration or destruction of the monuments, stakes, marks, or notices done without his fault, while he continues to perform the necessary work upon the claim. Book v. Justice Mining Co., C. C., 58 F. 106, 107, 114; Steele v. Preble, 158 Or. 641, 77 P. 2d 418; Young v. Papst, 148 Or. 678, 37 P. 2d 359, 364; Gobert v. Butterfield, 23 Cal. App. 1, 136 P. 516, 518; Upton v. Santa Rita Min. Co., 14 N. M. 96, 89 P. 275, 286; Moore v. Steelsmith, 1 Alaska 121, 129; Smith v. Newell, C. C., 86 F. 56, 57; Jupiter Min. Co. v. Bodie Consol, Min. Co., C. C., 11 F. 666, 677, 678; 30 U. S. C. A. sec. 28, n. 134; 9 F. C. A., Title 30, sec. 28, n. 25; 2 Lindley on Mines, 3d Ed., sec. 375, pp. 889, 890, n. 68; 1 Snyder on Mines, sec. 399; Shamel, Mining, Mineral and Geological Law, p. 118, n. 8; Ricketts, American Mining Law, sec. 530; 36 Am. Jur. Mines and Minerals, sec. 94, p. 346; 40 C. J., Mines and Minerals, sec. 212, p. 801, n. 64; 17 Cal. Jur. Mines and Minerals, sec. 40; Annotation, 7 L. R. A., N. S., 864.

Book v. Justice Min. Co., supra, was a case in the U. S. Circuit (now District) Court, District of

Nevada. The opinion was written by Judge THOMAS P. HAWLEY, who had previously been a justice and chief justice of this court, and concerning whom Mr. Lindley has written, "one of the most experienced and distinguished judges in the mining states." 1 Lindley on Mines, 3d Ed., sec. 282, p. 635. The rule relating to the effect of removal or obliteration of stakes, monuments, marks, or notices, approved by Judge Hawley in the Justice case, has not been changed by any decision of the U. S. District Court of the District of Nevada, of the Ninth Circuit Court of Appeals, of this court, or by Congress or the legislature of this state.

The court has not overlooked Pollard v. Shively, 5 Colo. 309, or Duncan v. Eagle Rock G. M. & R. Co., 48 Colo. 569, 111 P. 588, 593, 139 Am. St. Rep. 288—both cases favorably commented upon by Lindley. 2 Lindley on Mines, 3d Ed., sec. 375, p. 890. And we have read Thallman v. Thomas, 102 F. 935, decided in 1909 in the U. S. Circuit Court for the District of Colorado; also the last paragraph on page 60 of the 16th edition of Morrison's Mining Rights, 27 Cyc. p. 570, n. 68, and the cases cited in 30 U. S. C. A., sec. 28, n. 169, and in 9 F. C. A., Title 30, sec. 28 n. 36. But these authorities do not change the court's opinion that the title to the Albert locations had not reverted to the government when defendants' claims were located.

■ A prudent locator should of course do what he reasonably can to preserve and maintain his boundary monuments. As said by Lindley, "A failure to so preserve them exposes the owners to hazards incurred by death of locators and witnesses and other circumstances which might prevent the fact of marking from being established. Owners should therefore use reasonable diligence in preserving and restoring their boundary monuments. No presumptions flowing from the antiquity of the location will be indulged in as to the original marking as against a hostile claimant. But the law

does not require monuments. to be perpetuated."
2. Lindley on Mines, 3d Ed., sec. 375, p. 889. And see
1 Snyder on Mines, sec. 399, p. 367. One consequence
of lack of diligence in maintaining monuments, notices
and records is well illustrated in the instant case—
costly and troublesome litigation.

When the Albert claims were originally located, the
requisite location monuments and markings were placed
upon the ground. Some of them were still there when
defendants' claims were located. The record does not
show that defendants took any notice of these monu-
ments, made any inquiry of plaintiffs regarding the
boundaries of the Albert claims, or made any attempt
to ascertain the lines of the senior locations. See Tono-
pah & Salt Lake Min. Co. v. Tonopah Min. Co., C. C.,
125 F. 408; Eilers v. Boatman, 3 Utah 159, 2 P. 66.

The question naturally arises whether, when respond-
ents' claims were located, the Albert claims, though not
void, had nevertheless become subject to forfeiture—
a situation analogous to that resulting from the failure
of a locator to perform annual labor. There is some
authority supporting this view, but the court considers
it unnecessary to decide the question in the present
case, for the reason that if it were to be conceded that
such is the law it would not benefit respondents. In
stating the reasons which have led us to this conclusion,
we shall first take up the four claims located by Berto
and Hanson in 1935, following which the two claims
located by Mr. Carlson in 1940 will be discussed.

Appellants contend, as they did in the court below,
that when the Berto, Bennett, Edith Hild and Otto Han-
son claims were located, respondent mining company
was the tenant of plaintiffs, and so was estopped to
set up its title to said four claims in opposition to that
of its landlords, the plaintiffs, to the Albert claims. It
was held by the district court that the rule of estoppel
should not be applied in this case for two reasons:
first, that the relation of landlord and tenant is not

definitely shown to have existed until February 12, 1938; second, that the rule estopping a tenant from denying the validity of his landlord's title is not applicable to suits to quiet title. Neither of these grounds has been urged by respondents on this appeal. Their position is stated in their brief as follows: "We have no quarrel with established law that a tenant is estopped to attack his landlord's title. Appellants' legal premises in that regard are predicated upon the theory that the Albert claims were actually located in such manner as to include all of the areas embraced within respondents' subsequent locations, while respondents base title to those areas on mining locations made by entry upon the unappropriated public domain." Similarly, in the oral argument, counsel for respondents said: "Here the respondents are not attacking the title of appellants. They went on the unappropriated public domain and made their locations, and are merely defending their own locations and not attacking the title of the appellants. And although respondents' first locations were made some five years before the attempted amended locations by appellants, and although it appears in the record that the appellants well knew that those locations had been made * * * nothing was done, no attempt was made, no questions raised as to the validity of the locations, until after the respondents had ceased to make their payments on the options. It will be noted that these purported amended locations were attempted to be made some eighteen years after the original locations."

As respondents do not contend that the rule of estoppel now under consideration is inapplicable to suits to quiet title to unpatented mining claims, we shall do no more than cite two comparatively recent cases: Whealton v. Pine Grove Nevada Gold Mining Co., 9 Cir., 104 F. 2d 675; Oliver v. Burg, 154 Or. 1, 58 P. 2d 245. If the question is squarely presented to

this court in the future, it may then properly receive further consideration.

■■ In arriving at the conclusion that the relation of landlord and tenant was not definitely shown to have existed until February 12, 1938, the trial court stated that the date of the assignment from Zent to Ora Tahoma company was not shown, "so far as my notes reveal." That statement was made before the trial transcript had been completed. The transcript shows an express stipulation on the part of respondents that the assignment was made June 3, 1935. It was only five months thereafter that the Berto, Bennett, Edith Hild and Otto Hanson claims were located by the company's president and vice president. After taking the assignment of the Zent lease, the company proceeded to take possession of the Albert claims, moved buildings onto the No. 3 and performed work thereon. The law presumes that once a man goes into possession as a tenant, the relationship continues until the contrary is made to appear. Ashton v. Golden Gate Lumber Co., 6 Cal. Unrep. 307, 58 P. 1; Little v. Kendrick, 152 Fla. 720, 12 So. 2d 899; Holton v. Jackson, 184 Ky. 559, 212 S. W. 587. The evidence does not disclose just when the four claims of the Berto group were acquired by the company, but it was some time during the tenancy, which began before the claims were located and continued until January 1940. The evidence shows, and the court below found, that defendants never have surrendered possession of the Albert group, and in particular the No. 3, to the plaintiffs. Those claims were in the permissive possession of the company as assignee of the Zent lease when the Berto group was located in November, 1935; this is not disputed by respondents on this appeal. It is the opinion of the court that the Berto, Bennett, Edith Hild, and Otto Hanson claims should have been held invalid insofar as they conflict with any of the Albert group. Byrnes v.

Douglass, 23 Nev. 83, 42 P. 798; 36 Am. Jur., "Mines and Minerals," sec. 47; 40 C. J., Mines and Minerals, sec. 598, p. 1003; 32 Am. Jur., Landlord and Tenant, sec. 120.

■ The fact that plaintiffs did not amend their locations until 1940 has no bearing upon the question of estoppel, and respondents' statement that appellants well knew that the Berto group had been located is not borne out by the record, if it was intended by that statement to say that appellants knew about said locations before 1940. We have carefully examined all the parts of the record relied on by respondents as showing that appellants knew about the location of the Berto group, but whether appellants had any such knowledge before 1940 does not appear, and there is nothing in the evidence showing that appellants knew until the spring of 1940 that respondents were asserting title to some of the Albert ground. The court therefore is not required to decide whether it would have any effect on the applicability of the rule of estoppel if it had been shown that plaintiffs knew, for some years before 1940, about the location of the Berto group, and defendants' adverse claim of title.

We come now to the Arthur and Arthur No. 1 claims. These claims are in conflict with the Albert No. 3 only. The Arthur was located before, and the Arthur No. 1 after, the filing of plaintiffs' amended certificates of location of the Albert claims. The latter claims were evidently amended under the provisions of sec. 4125, N. C. L., 1929, which reads: "If at any time the locator of any mining claim heretofore or hereafter located, or his assigns, shall apprehend that his original certificate was defective, erroneous, or that the requirements of the law had not been complied with before filing; or shall be desirous of changing his surface boundaries or of taking in any part of an overlapping claim which has been abandoned; or in case the original certificate was made prior to the passage of this law, and he shall be

desirous of securing the benefits of this act, such locator or his assigns may file an additional certificate, subject to the provisions of this act; provided, that such relocation does not interfere with the existing rights of others at the time of such relocation, and no such relocation or the record thereof shall preclude the claimant or claimants from proving any such titles as he or they may have held under previous location." This section is almost verbatim with the Colorado statute. Morrison's Mining Rights, 16th Ed., p. 155.

■ The new monuments had been placed on the Albert No. 3 before either the Arthur or Arthur No. 1 was located. The Arthur No. 1 is clearly void insofar as it conflicts with the Albert No. 3, because, as we have seen, the latter claim had been newly monumented and the amended certificate of location filed before the Arthur No. 1 was located.

■ With respect to the Arthur, the question arises whether that part of the Albert No. 3 in conflict with it is void because the certificate of location of the Albert No. 3, was not filed till after the Arthur was located. This question seems to be answered by the construction which has been placed upon the first part of the proviso near the end of said sec. 4125. McEvoy v. Hyman, C. C., 25 F. 596, 599; Frisholm v. Fitzgerald, 25 Colo. 290, 53 P. 1109, 1110. In the former case Judge Hallett said: "The better opinion appears to be that the proviso relates only to the matter of taking into the claim new territory." In the Frisholm case the court said that the proviso relating to existing rights "is only applicable to a change of boundaries and relocation that should take in territory not before included within the claim." In the instant case there was no intention on the part of plaintiffs, and they did not in fact, take in any ground by their amended locations which was not before included within their claims. What was done and what was intended was to draw in the lines of the Albert claims so that they would not occupy a

greater area, particularly in length, than allowed by law. The court is therefore of the opinion that the Arthur does not take priority over the Albert No. 3, and that the former, as well as the Arthur No. 1, should have been held invalid insofar as it conflicts with said Albert No. 3.

Appellants contend that the rule of estoppel should apply with respect to the Arthur and Arthur No. 1 as well as to the four claims located in 1935. They argue that although the relation of landlord and tenant had terminated before these two claims were located, yet there had been no redelivery or surrender of the Albert claims; and they cite sec. 8512, N. C. L. 1929. It is deemed unnecessary, however, to pass upon this contention in view of what has been said concerning these two claims in the preceding paragraphs.

In connection with the question as to whether the ground covered by defendants' claims was open public domain at the time they were located, objection was made by defendants to testimony by witnesses Sproule and Summerville as to declarations made by Mikesell during his lifetime with respect to certain original monuments on the Albert claims. These declarations were testified to as having been made at times when Mikesell was one of the owners in possession of the Albert group, while he and the witnesses were on the ground straightening up or rebuilding some of the monuments, and at times when there was no motive to misrepresent. The objection was argued at considerable length and carefully considered by the trial court, which overruled defendants' objection. While such evidence is of less weight than testimony which is free from the infirmities of hearsay, it is admissible by the great weight of authority in this country. V. Wigmore on Evidence, 3d Ed., secs. 1564, 1566, 1567, 1568; 31 C. J. S., Evidence, sec. 236; 8 Am. Jur., Boundaries, secs. 96, 98; Clark, Surveying and Boundaries, sec. 230, sec. 233, n. 23; Gillett, Indirect

and Collateral Evidence, sec. 171. The weight to be given this testimony was for the trial court, and it is not clear to this court that it was given more weight than was proper.

Respondents claim that the trial court's finding XIX is inconsistent with that court's general findings I and II, with its special findings II, IV, V, VI, VII and VIII, and with its conclusions of law numbered 1, 2 and 3; and that said finding XIX is superseded and controlled by the other findings and conclusions just mentioned. In the court's opinion this contention is without merit, and requires no discussion.

Respondents direct attention to the well established rule that where there is sufficient evidence in the record to support the findings of the trial court its judgment will not be disturbed, and that findings made by the trial court upon conflicting testimony will not be disturbed on appeal unless clearly erroneous. This rule does not operate to respondents' advantage in this case, because we have followed the findings of fact made by the trial court and have differed only on certain questions of law.

That part of the judgment appealed from, and the order denying plaintiffs' motion for a new trial, are reversed, and the cause remanded for a new trial.