HARRY L. SCOGGIN, ROGER D. THOMAS, IMO-
GENE C. THOMAS, ERNEST SCOGGIN, ELVER-
DA SCOGGIN, JAMES T. McGUCKIN, CLAIRE
C. McGUCKIN, ELSA J. SCOGGIN, L. J. BRIM-
MER, K. M. BRIMMER, GEORGE E. JOLLEY,
MILLICENT E. JOLLEY, AND LEWIS A. GRUE-
GER,

*Plaintiffs and Appellants,*

vs.

LESLIE A. MILLER, MARGARET M. MILLER,
KATHERINE M. MABEE, JOHN S. MILLER,
ARTHUR H. READ, LEE W .READ, HERBERT
W. READ, WINIFRED M. READ, MRS. T. J.
CARROLL, BERNARD HOWELL, RAY E. LEE,
D. AVERY HAGGARD, ADELAIDE B. LEE,
JOHN D. MABEE AND MARTHA B. HAGGARD,

*Defendants and Respondents.*

(No. 2379; February 10th, 1948; 189 Pac. 2d. 677)

208

See, also, 189 P. 2d 693.

For the plaintiffs and appellants the cause was submitted on the brief and oral arguments of E. C. Raymond of Newcastle, Wyoming and James T. McGuckin of Sundance, Wyoming.

For the defendants and respondents the cause was submitted on the brief and oral argument of Albert D. Walton of Cheyenne, Wyoming.

210

212

214

## OPINION

RINER, Chief Justice.

This case is a direct appeal proceeding asserting that there is prejudicial error in a judgment rendered by the district court of Crook County in an action brought by Harry L. Scoggin, Roger D. Thomas, Imogene C. Thomas, Ernest Scoggin, Elverda Scoggin, James T. McGuckin, Claire C. McGuckin, Elsa J. Scoggin, L. J. Brimmer, K. M. Brimmer, George E. Jolley, Millicent E. Jolley, and Lewis A. Grueger as plaintiffs in that court against Leslie A. Miller, Margaret M. Miller, Katherine M. Mabee, John S. Miller, Arthur H. Read, Lee W. Read, Herbert W. Read, Winifred M. Read, Mrs. T. J. Carroll, Bernard Howell, Ray E. Lee, D. Avery Haggard, Adelaide B. Lee, John D. Mabee, and Martha B. Haggard as defendants seeking to have the plaintiffs' title in certain alleged placer mining claims embracing described lands in said county adjudged to be superior to the title of the defendants to said lands and that the title to these lands be quieted in the plaintiffs. The defendants on the other hand assert title to this real estate and insist that they are the owners of earlier locations of sundry placer mining claims including the larger part of the lands aforesaid.

For convenience and brevity the mining claims of the plaintiffs who were the subsequent locators of the premises in controversy will be hereinafter frequently referred to as the "S" claims or locations and the plaintiffs themselves will be designated as the "S" locators. The defendants' mining claims will usually hereinafter be designated as the "M-R" mining claims or locations and the defendants as the "M-R" locators. The lands involved, aside from the effect to be given these mining locations, are at present part of the public domain held and owned by the United States and, according to the proofs submitted, are mineral in character, containing the substance commonly known as bentonite.

The M R locators have filed in the United States Land Office at Buffalo, Wyoming an application to patent the several mining claims which they assert they own and a duly published notice thereof was given for sixty days in a newspaper designated by the register of that office as published nearest to said claims, all as required by law. (R. S., Section 2325; 21 Stats. 61; 43 Stats. 1144-1145; U. S. C. A., Title 30, Section 29). Also as required by the federal law governing the patenting of mining claims, the S locators filed their adverse claim during the publication period of this notice and within the specified thirty day period thereafter brought their action in the district court above named to have determined the possessory title to and their right of possession of said lands. (R. S. 2326; 43 Stats. 1144-1145; U. S. C. A., Title 30, Section 30). The action as already intimated, was one in the nature of a suit to quiet title and the defendants answered it by denials and a cross petition also asking that the title to the lands involved be quieted in said M-R locators. Plaintiffs in due course filed their reply putting the cause at issue. The trial was to the court without a jury. It will be observed that both plaintiffs and defendants

claim their titles from a common source, viz. the United States. As pointed out by this court in York vs. James, 62 Wyo. 184, 165 Pac. 2d 109 in such case the only question is who has the better title and the consequent right of possession. See also Ricketts, American Mining Law, pp. 224-5, (3d Ed. 1931).

During the months of May and June, 1937 certain parties who may be designated as the "Williams group" located a large acreage in Crook County, Wyoming upon the then unappropriated mineral lands of the United States by means of a number of alleged placer mining claims embracing one hundred sixty acres for each claim. The trial court in its findings of fact made upon the conclusion of the trial found that the Williams group had complied with the provisions of Section 57-921 W. C. S. 1945 (W. R. S. 1931, Section 70-121) hereinafter quoted, setting forth the required contents of a placer mining location certificate and prescribing the method to be employed in locating a placer mining claim in this state. The court also found that these locators had performed annual labor upon each of said claims amounting to $100 or more for stated years following that in which the locations were made and that thereafter said locators had filed in the office of the county clerk and ex officio register of deeds of Crook County, Wyoming, the proper affidavit of such assessment work, all as required by Sections 57-922, 57-923, 57-925 and 57-926, W. C. S., 1945 (W. R. S. 1931, Sections 70-122, 70 123, 70-125 and 70-126), also hereinafter set forth. These affidavits were filed for the years ending July 1, 1938, 1939, 1940, and 1941. In passing it may be noted that in Norris vs. United Mineral Products Company, 61 Wyo. 386, 158 Pac. 2d 679, it was pointed out that the date of January 1 as mentioned in the statutes last cited had since their enactment been altered by the operation of the paramount federal statute (Title 30, U. S. C. A., Section 28) to July 1 of

each year. The above findings of the court were based upon evidence in some respects conflicting but in the light of the established principles of appellate practice to be presently mentioned they should stand here. Section 57-921 W. C. S. 1945 reads:

"Hereafter the discoverer of any placer claim shall, within ninety (90) days after the date of discovery, cause such claim to be recorded in the office of the county clerk and ex officio register of deeds of the county within which such claim may exist, by filing therein a location certificate, which shall contain the following:

1. The name of the claim, designating it as a placer claim;
2. The name or names of the locator or locators thereof;
3. The date of location;
4. The number of feet or acres thus claimed;
5. A description of the claim by such designation of natural or fixed objects as shall identify the claim beyond question. Before filing such location certificate, the discoverer shall locate his claim: First, by securely fixing upon such claim a notice in plain painted, printed or written letters, containing the name of the claim, the name of the locator or locators, the date of the discovery, and the number of feet or acres claimed; second, by designating the surface boundaries by substantial posts or stone monuments at each corner of the claim."

The other sections of this statutory compilation referred to use this language:

"§ 57-922. For every placer claim, assessment work, as hereinafter provided, shall be done during each and every calendar year after the first day of January following the date of location. Such assessment work shall consist in manual labor, permanent improvements made on the claim in buildings, roads or ditches made for the benefit of working such claims, or after any manner, so long as the work done accrues to the im-

provement of the claim, or shows good faith and intention on the part of the owner or owners and their intention to hold possession of said claim."

"§ 57-923. On all placer claims heretofore or hereafter located in this state not less than one hundred dollars ($100.00) worth of assessment work shall be performed during each calendar year from the first day of January after the date of location."

"§ 57-925. Upon failure of the owners to do or have done the assessment work required within the time above stated, such claim or claims upon which such work has not been completed, shall thereafter be open to re-location on or after the first day of January of any year after such labor or improvements should have been done, in the same manner and on the same terms as if no location thereof had ever been made; provided, that the original locators, their heirs, assigns or legal representatives have not resumed work upon such claim or claims after failure, and before any subsequent location has been made."

"§ 57-926. Upon completion of the required assessment work for any mining claim, the owner or owners or agent of such owner or owners shall cause to be made by some person cognizant of the facts, an affidavit setting forth that the required amount of work was done, which affidavit shall within sixty (60) days of the completion of the work, be filed for record, and shall thereafter be recorded in the office of the county clerk and ex officio register of deeds of the county in which the said claim is located."

About the middle of June, 1941 these locators, i. e., the Williams group, or their grantees, conveyed by quit claim deed their interest in some fifteen placer mining claims thus located and worked, to Leslie Miller and A. H. Read, two of the persons included in the M-R locators, for a consideration of $5000, the parties last mentioned having obtained an option to purchase said claims for the sum of $100 some time previously. In one or two instances the ground thus conveyed did not embrace the entire acreage of the Williams group claims which were all designated by specified quarter

sections under the system of United States land surveys, the several iron posts of such government surveys all duly appearing in place upon the ground.

With the above quoted sections of the Wyoming statutes governing the disposition of mineral resources in the public lands within this state may appropriately be read the following provisions of federal law referring to placer mining claims generally. These are: R. S. Sections 2329, 2331; Ch. 561 Section 4, 26 Stats. 1097; U. S. C. A. Title 30, Section 35 which enacted that:

"Claims usually called 'placers', including all forms of deposit, excepting veins of quartz, or other rock in place, shall be subject to entry and patent, under like circumstances and conditions, and upon similar proceedings, as are provided for vein or lode claims; but where the lands have been previously surveyed by the United States, the entry in its exterior limits shall conform to the legal subdivisions of the public lands. And where placer claims are upon surveyed lands, and conform to legal subdivisions, no further survey or plat shall be required, and all placer-mining claims located after the 10th day of May 1872, shall conform as near as practicable with the United States system of public land surveys, and the rectangular subdivisions of such surveys, and no such location shall include more than twentyacres for each individual claimant; but where placer claims cannot be conformed to legal subdivisions, survey and plat shall be made as on unsurveyed lands; and where by the segregation of mineral land in any legal subdivision a quantity of agricultural land less than forty acres remains, such fractional portion of agricultural land may be entered by any party qualified by law, for homestead purposes."

And R. S. 2330; Ch. 561, Section 4, 26 Stats. 1097; U. S. C. A. Title 30, Section 36 which reads:

"Legal subdivisions of forty acres may be subdivided into ten-acre tracts; and two or more persons, or associations of persons, having contiguous claims of any size, although such claims may be less than ten acres each, may make joint entry thereof; but no location of a placer claim, made after the 9th day of July 1870,

shall exceed one hundred and sixty acres for any one person or association of persons, which location shall conform to the United States surveys; and nothing in this section contained shall defeat or impair any bona fide homestead claim upon agricultural lands, or authorize the sale of the improvements of any bona fide settler to any purchaser."

The trial court further found that on June 3, 1941, the M-R locators, the defendants herein, including the said Leslie Miller and A. H. Read, the grantees of the Williams group of locators, made discoveries of bentonite upon the ground included in the claims conveyed to Miller and Read as above stated and also upon four other parcels of ground not included in that conveyance; these four parcels being designated as the Milread Nos. 1, 2, 3 and 4 Placer Mining Claims; that the M-R locators complied with the statutes of the State of Wyoming in the various details required for locating not only the four claims just mentioned but also thirteen others known as the Milread No. 6, Nos. 8 to 16 inclusive, and the Milread Nos. 18, 19 and 20. All of these M-R mining claims embrace stated quarter sections or subdivisions thereof according to the United States Public Land surveys. It was also found that during the year ending July 1, 1941 the M-R locators aforesaid had done annual labor on all of said claims of the value of $1800.

In order to understand exactly how and upon what lands the M-R mining claims were located, their specific names and description are herewith set forth: The Milread Placer Mining Claims Nos. 1 to 4 inclusive embrace in the order named the SE¼, the SW¼, the NW¼ and the NE¼ of Section 33, Township 58 N., Range 65 W., 6th P. M.; the Milread Placer Mining Claims Nos. 6 and 8 include respectively the NW¼ and the SW¼ of Section 3, Township 57 N., Range 65 W., 6th P. M.; the Milread Placer Mining Claims Nos.

9 to 12 inclusive embrace in the order named the NE¼, the NW¼, the SE¼, and the SW¼ of Section 4, Township 57 N., Range 65 W., 6th P. M.; the Milread Placer Mining Claims Nos. 13 to 16 inclusive embrace in the order given the NE¼, the NW¼, the SE¼ and the SW¼ of Section 5 in Township 57 N., Range 65 W., 6th P. M.; the Milread Placer Mining Claim No. 18 includes the SW¼ of the NE¼, the E½ of the NW¼ and the SW¼ of the NW¼ of Section 10, in the Township and range last above mentioned; the Milread Placer Mining Claim No. 19 includes the NW¼ of the NW¼ of Section 10, the N½ of the NE¼, the SE¼ of the NE¼ of Section 9 in the township and range last above recited; and the Milread Placer Mining Claim No. 20 embraces the N½ of the NW¼, the SW¼ of the NW¼ of said Section 9.

On May 7, 1942 the national congress passed an act suspending the requirement of annual assessment work or annual labor on mining claims on the public domain "during the years beginning at 12:00 o'clock meridian July 1, 1941 and ending at 12:00 o'clock meridian July 1, 1943" (56 Stats. 271, Ch. 294). Thereafter the same legislative body on May 3, 1943 renewed the former act of suspension by an act reading:

"The provision of section 2324 of the Revised Statutes of the United States (section 28 of this title), which requires on each mining claim located, and until a patent has been issued therefor, not less than $100 worth of labor to be performed or improvements aggregating such amount to be made each year, be, and the same is hereby, suspended as to all mining claims in the United States, including the Territory of Alaska, until the hour of 12 o'clock meridian on the 1st day of July after the cessation of hostilities in the present war as determined by proclamation of the President or concurrent resolution of the Congress: *Provided,* That every claimant of any such mining claim, in order to obtain the benefits of this Act, shall file, or cause to be filed, in the office where the location notice or certificate

is recorded, on or before 12 o'clock meridian of July 1 for each year that this Act remains in effect, a notice of his desire to hold said mining claim under this Act." (Ch. 91, 57 Stats. 74; 1946 Cum. Ann. Pocket Part of Title 30 Section 28a p. 7 U. S. C. A.)

Under these suspension of annual labor enactments, the M R locators filed in the county clerk's office of Crook County, notices in lieu of annual labor for the years ending July 1, 1942, 1943, 1944, and 1945, all of these notices being filed in that office on or before July 1 of the year for which the exemption from performing the annual labor or assessment work was claimed, except for the year 1944 which was not filed until Monday, July 3, 1944, but before any of the rights of the plaintiffs, the S locators, or any other person or persons in said lands had been acquired and the district court so found.

Additionally there was a finding by the trial court in substance that on October 9, 1944 Miller and Read with Howell and one L. J. Brimmer went on the M-R Placer Mining claims; that Howell being a surveyor was employed to survey said claims and establish the several corners of forty acre tracts. He was also to supervise the work of Brimmer who was employed to drill test holes upon said claims in order to develop the depth, quantity and quality of the bentonite beds in said claims. Howell, as a matter of fact, did survey a portion of said claims and then left Brimmer to continue the drilling work upon the ground in order to fully develop said claims in the particulars mentioned. While Brimmer was engaged in this work, Harry L. Scoggin, one of the plaintiffs, came to Brimmer and, as the finding reads:

"told him that he, Scoggins, was going to take the bentonite from said claims, and while said L. J. Brimmer was engaged in said work, said Harry L. Scoggins, one of the plaintiffs, came upon said claims and started staking the same, and thereupon, the said L. J. Brim-

mer, without the consent of the defendant, deserted his employment and said claims and did not notify the defendants that he was not on said claims, working, until about the 15th day of November, 1944; that in the meantime, a heavy snow had fallen upon said land and the ground froze and it was impossible to work or develop said claims or do assessment work or annual labor thereon until about June 1, 1945, when the defendants went upon said land and continued with their development and assessment work and annual labor. That the defendants, beginning on or about the 9th day of October, 1944, resumed work upon said claims and continued the same with due diligence until they had done work and labor upon said land in excess of $100.00 per claim."

The S Placer Mining Claims were undertaken to be established in the manner thus indicated on November 3, 4, 5 and 6, 1944 and for the most part conflict exactly with the M-R locations, hence the necessity arose for the S locators to file their adverse claim aforesaid and institute the action in the district court as already detailed.

The 13th, 14th, and 15th paragraphs of the findings of fact of the trial court were as follows:

"13. That during the year ending July 1, 1945, the defendants did assessment work and annual labor upon said claims in excess of $100.00 per claim, and that during the months of July and August, 1945, the defendants performed labor and supplied materials for work upon said claims and upon roads leading to said claims, which was performed for the benefit of said claims and the development thereof, in excess of $10,-000.00.

"14. That said lands embraced in said placer mining claims were in the possession of said defendants at the time plaintiffs claim to have made their several locations of placer mining claims thereon, and that none of said lands embraced in defendants said claims were unappropriated public land and subject to location under the mining laws of the United States at the time plaintiffs claim to have made their locations thereon.

"15. That·the defendants were at all times from June 3, 1941, up to and including the 3rd, 4th, 5th, and 6th of November, 1944, in possession of all said lands embraced in their said placer mining claims."

As may be inferred from the facts thus found by the district court, a judgment for the defendants and respondents here was entered adjudging the title and possession of said M-R placer mining claims to be rightfully in the M-R locators as against the claims of the S locators.

Other facts and findings of the district court will be subsequently referred to as may be necessary in connection with the consideration of the several contentions advanced in appellants' attack upon the propriety of the judgment aforesaid.

Before proceeding to examine these contentions, however, we must again mention two principles of appellate court practice which we have announced so repeatedly in previous decisions and which necessarily must control our view of the evidence appearing in the voluminous record submitted. The members of the profession are rather frequently inclined to overlook these pronouncements and so apparently they still require mention on our part. These established principles are: (1) Where, as here, there are assignments of error that the judgment of the district court is not sustained by sufficient evidence and is contrary to law we:

"must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it." Dulany vs. Jensen, 63 Wyo. 313, 181 Pac. 2d, 606 and cases cited.

(2) The trial court's findings on conflicting testimony will not be disturbed where there is substantial evidence tending to support the judgment. Rienecker vs.

Lampman, 55 Wyo. 159, 96 Pac. 2d, 561 and Wyoming cases cited in 5 C. J. S. 737, Section 1657, Note 95. See also Nussbacker vs. Manderfeld, 64 Wyo. 55, 186 Pac. 2d, 548.

It is contended for the plaintiffs and appellants, the S locators, that neither the predecessors of the defendants (the Williams group) nor the defendants themselves (the M-R locators) complied with the legal requirements in locating their several claims, viz. that they failed to post a notice of discovery upon each claim; to designate the surface boundaries of their claims by substantial posts at each corner or angle thereof and to post notices of location upon each of their claims. Also that where the M-R claims cornered in the center of a section the M-R locators and their predecessors failed to erect posts or other substantial monuments which should be put there to designate the surface boundaries of their several claims, and no location notices were placed upon said claims at these particular corner or angles. These contentions are asserted by the respondents, the M-R locators, to be without foundation in fact. It is additionally urged that as to one claim (The Milread Placer Mining Claim No. 14) the certificate of location was void because the township number was omitted from the description of the claim. The respondents resist this contention also.

For the Williams group of locators who conveyed their interests to the M R locators, Miller and Read, as before stated, there was evidence submitted that they employed one Engle to mark the surface boundaries of the fifteen claims which the Williams group had selected to be located as placer mining claims, to dig discovery holes, to put up notices of discovery and make location certificates; that Engle did these things; that about a week after he had finished, his work was inspected by Fred J. Williams; that this was the latter part of June or the early part of July, 1937, that the

surface boundaries of these claims were marked by 4" x 4" stakes, most of them about thirty inches long driven into the ground about twelve inches, leaving about twenty inches above it; that these stakes were placed in the middle of each section and at the corners of each of the claims; that the location notices were placed in tin cans which were fastened on these stakes; that the location notices aforesaid were combination notices of both location and discovery, such as were in general use in that country; that these notices were in separate cans, i. e., if there were two notices, they were in separate cans; that copies of these location notices were recorded in the office of the county clerk and ex officio register of deeds of Crook County in 1937 after the location work on the claims had been done on the ground; that each year thereafter, the annual labor was done on these claims until they were sold to Miller and Read in June, 1941; and that as to each claim, there was duly recorded an affidavit of performance of annual labor for the years ending July 1, 1939, July 1, 1940; that the 4" x 4" posts erected at each corner of each claim were substantial; that when the claims were shown to Miller prior to the sale of them to Miller and Read in 1941, as already mentioned, the stakes were there on each corner of the several claims. The copies of the location notices of these claims duly certified by the county clerk and ex officio register of deeds of Crook County, and the recorded affidavits of annual labor aforesaid were received in evidence without objection.

For the M-R locators there was evidence submitted that following the final acquisition of the Williams group claims, the ground included therein was for the most part relocated by the former; that the M-R locators brought a large number of wide-mouth, screw-top bottles, and their combination location and discovery certificates or notices were folded one to four notices to

a bottle, dependent on the particular location where it was to be placed, so that the one which was designed to be the location notice at a particular corner for a particular claim, the name of the claim could be read through the glass of the bottle, and in addition an ordinary shipping tag was placed in that bottle on which tag the corner of the section, whatever corner it was, was designated, and in addition, the corners of the claims; i. e., whether there was one claim, two claims, three claims, or four claims, the claims were named on that shipping tag which was placed in the bottle in such a manner that it also could be read through the glass of the bottle; that anyone interested could take the cap off the bottle, take the notice or notices out and read everything that was there; that these combined certificates each gave the name or names of the placer claim or claims, the names of the locators, the date of discovery and location, the number of acres claimed, together with a description of the claim or claims by indicating the particular quarter section or portion thereof, township and range in the United States system of land surveys, included in the claim or claims and also described the placing of stakes or posts at each corner of the claim or claims, upon each of which was marked a description of the said corner and the name and date of location of the mining claim.

The evidence for the M-R locators also disclosed that the great majority of bottles were fastened by means of wires to 4" x 4" posts which were already there, and set at the corners of the claims; that in case no post was found left from those erected by the Williams group of locators, another post was found and put there; that these posts thus used were substantial; that where two or more claims cornered at the place where the notices were put in the bottle, one, two, three or four notices, as the case might be, were used to account for the proper number of claims cornering at that point; that

notices were posted at all angles of the several claims; that the posts at the several corners of each claim were located wherever it was possible as close as within a few inches of the Government iron corner and directly on the line so that part of the post was in one claim and part in the other; that every corner of each claim was posted and staked wherever it was; that on the irregular claims (Milread Placer Mining Claims Nos. 18, 19 and 20) the location and discovery notices were also posted on the corners; that the posts employed were thirty to forty inches in length, set in the ground a foot to a foot and a half; that by 4" x 4" is meant four inches square; that the location certificates or notices were filed for these claims by the M-R locators on July 1, 1941; that in locating the Milread Nos. 1, 2, 3 and 4 Placer Mining Claims, the same procedure was followed by the M R locators as was employed as to the ground included in those claims which were purchased from the Williams group; that notices in lieu of annual labor for the years 1942, 1943, 1944 and 1945 were filed by the M-R locators in the office of the county clerk and ex officio register of deeds of Crook County, all of them, except that for the year 1944, being filed prior to twelve o'clock meridian of July 1st of each year; that the in lieu notice for the year last mentioned was filed July 3, 1944.

There was testimony introduced by the plaintiffs that there were no posts erected by the M-R locators at the corners of their claims which met in the center of sections and that no notices of location were placed upon these claims at these places; also that the M-R locators had failed to place substantial posts to mark the boundaries of their claims or to post notices of location upon each claim. However, testimony of this character resulted only in a conflict with that of the M-R locators before the district court, and upon which

that court's finding must, as heretofore indicated, necessarily control here.

There is considerable testimony in the record that at certain corners of the M-R locations, their posts and location notices could not be found but there do not seem to be proofs in the record that the plaintiffs examined what was done by either the Williams group of locators in 1937 or the M-R locators in 1941 shortly after several dates of location. Even if such examination had been made the testimony based thereon might or might not have resulted merely in a conflict in the evidence. In this connection it may be of material assistance to call attention to the following authorities:

In Young vs. Papst, 148 Oregon 678, 37 Pac. 2d 359 the court said:

"There is evidence tending to show that the claims were located in the manner alleged in the amended complaint and that the corners and boundaries of each claim were so marked that the same could readily be determined and traced. The mere fact, if it be a fact, that defendants were unable to find any stakes or to trace the boundaries of the claims is not conclusive proof that the plaintiff did not distinctly mark the boundaries. It is altogether possible that the stakes may have been obliterated or destroyed without fault of the plaintiff. Relative to obliteration of boundary markings, it is thus stated in 18 R. C. L. 1135:

'It is a well known fact that the boundaries as marked upon the ground, and the notices thereon posted, often disappear within a very short time, but there is no requirement in the law that they shall be maintained or replaced by the locator in order to keep his location good. When the location of a mining claim is once sufficiently marked upon the surface so that its boundaries can be readily traced, and all the other acts of location are performed as required by law, the right of possession becomes fully vested in the locator, and cannot be divested by the removal or obliteration of stakes, monuments, marks or notices, without the act or fault of the locator, during the time he continues to perform

the necessary work upon the claim, and comply with the law in all other essential respects.'"

The much later case of Steele vs. Preble, 158 Oregon 641, 77 Pac. 2d 418 is to the same effect.

Morrison's Mining Rights (16th Ed.) p. 60 states that:

"Once properly set, stakes have performed their original office and their subsequent removal or obliteration not done by the act of the party does not vitiate the claim.—*Book v. Justice M. Co.*, 58 F. 106, 107, 17 M. R. 617; McEvoy v. Hyman, 25 F. 596, 15 M. R. 397; *Smith v. Newell*, 86 F. 56; *Gobert v. Butterfield*, 23 Cal. App. 1, 136 P. 516; *Bender v. Lamb*, 133 Cal. App. 348, 24 P. (2d) 208."

See also 40 C. J. 801, Section 212 and cases cited.

The Supreme Court of Colorado in Treasury Tunnel Etc. Co. vs. Boss, 32 Colo. 27, 31, 74 Pac. 888 very accurately observed:

"It is a well-known fact that the boundaries as marked upon the ground, and the notices thereupon posted, within a very short time often disappear, and there is no requirement in the law that they shall be maintained or replaced by the locator in order to keep his location good."

Additionally as bearing strongly upon the contentions of plaintiffs as set forth above may appropriately be considered the following excerpts from the record before us, their substance being outlined as follows:

Harry L. Scoggin, the agent and representative of the S locators, and who did or supervised the location work undertaken on behalf of those locators, testified on cross examination as follows: that Scoggin saw L. J. Brimmer on the M-R claims for a number of days immediately before he (Scoggin) made the Scoggin locations on November 3, 4, 5 and 6, 1944; that Brimmer told Scoggin that he, Brimmer, was testing out the

claims; that Scoggin saw holes that had been drilled and that Brimmer had drilling tools; that he told Scoggin he was working for Miller; that Scoggin knew Miller was one of the former locators; that Scoggin told Brimmer before he (Scoggin) made the locations that the M-R claims were valuable and that he (Scoggin) was going to locate them; that Scoggin rode over the M-R claims on horseback frequently quite a number of years including the fall of the year 1944; that he knew Miller and associates claimed to have located the M-R mining claims; that from June or July, 1941 to the time Scoggin claimed to have located the Scoggin Placer Mining Claims, *Scoggin had been at every corner of the M-R claims and Scoggin knew where the corners were;* that Brimmer was working on the M-R claims the day he (Scoggin) started to make the Scoggin locations; that when Scoggin made his locations he went to the corners of each quarter section and set a stake there; that there were M-R stakes wherever there was a Government survey peg—one stake. (Italics supplied).

The same witness stated on re-direct examination in response to the question "about how many stakes did you see on the ground of all the M R claims that had a bottle attached"—"well, I think there would be about thirty-five or forty posts"; that not that many had bottles attached; that the average size of them (the posts) would be two or three inches in diameter, a lot of rounded stakes, a few square 4 x 4's about a foot long set in the ground six or eight inches; that he has a Taylor Grazing lease from the United States of America on part of these lands and he has been over these lands on an average of at least once a week during the grazing season; that Brimmer had tools to drill small holes in the ground; that none of Scoggin's deeded land with right to the minerals was included within

these locations; that he owns the surface to some of it and has leases on the rest.

On re-cross examination Scoggin testified also that he owns part of the land in Section 10, the minerals being reserved to the Government; that he can not give just exactly the description of these lands; that he also owns some land in Section 3, with minerals reserved, but he can not give its description; that these are the only two pieces of deeded lands he owns; that he has land in Section 33, the SE¼ of that section under the Taylor Grazing Act; that he does not believe the Taylor Grazing Act lease covers all of Section 33; it covers the majority of the land in the NE¼ all except a forty, and the SE¼, the SW¼ of that section; that he had a Taylor Grazing Act lease on some of Section 4, the NE¼ and SE¼ and most of the NW and SW quarters. On re-direct examination this witness also said that no one had offered to put up a bond for damages that might be incurred to the surface of either the deeded or leased land. Just here it may be observed that there was testimony on behalf of the M-R locators to the contrary of the statement made in the last sentence.

On cross examination after recall Scoggin further stated that before he made the Scoggin locations in 1944 *he had gone to the office of the county clerk and ex officio register of deeds of Crook County and looked over the records and he knew from that investigation that the defendants in this case, the M-R locators, had filed location certificates upon these identical claims; that he knew that they (the M-R locators) were claiming them at that time; that he knew the boundaries of all the claims they were claiming.* (Italics supplied.)

Keeping in mind the testimony reviewed above of this man who, as we have said, acted for the Scoggin locators in making their locations in November 1944,

four and a half years after the M-R locations had been made upon the ground and record duly made of them in the office of the county clerk and ex officio register of deeds of Crook County, we now turn briefly to what the appellate courts have said about the situation thus disclosed:

Discussing alleged defective notices or certificates of location Mr. Lindley says:

"Where it is shown that a subsequent locator had actual notice of the location and the boundaries, neither he nor his grantee should be permitted to take advantage of some technical defect in the notice." 2 Lindley on Mines, 910, Section 383 and cases cited.

In Steele vs. Preble, 158 Oregon 641, 77 Pac. 2d 418, 428, a case heretofore mentioned, it is said:

"The purpose of posting a notice and marking the boundary lines is to inform and guide others who may wish to make locations in that vicinity. But one who has knowledge of the boundaries of a mining claim cannot complain of the absence of stakes, monuments, etc., which are intended to identify the boundary lines. 30 U. S. C. A. p. 170, footnote 87. Likewise, he cannot complain because of a defect in the posted notice. 30 U. S. C. A. p. 175, footnote 120. The plaintiffs presented evidence that Preble, before making his locations, had detailed information of the extent, nature, and location of the plaintiffs' claims. According to Schollhorn, Preble pointed out to him one of the lines. Accordingly, a mere defect in the lines or notices could avail the defendants nothing."

The Supreme Court of Idaho, has lately said in Gerber vs. Wheeler, 62 Idaho 673, 115 Pac. 2d 100, 103:

"the conduct here disclosed clearly evidences knowledge, on the part of appellants, that the mineral land in question was no longer a part of the public domain but was rather held under a prior location made by Stock. It also discloses that they knew the substantial location and boundaries of the Humbug No. 1 claim, with sufficient certainty to render it unnecessary for respond-

ents to prove and identify their stakes, discovery and boundary lines. It will be noted that, in his affidavit (supra), Gerber said: 'That all stakes, monuments and trees marking boundaries of said claims are in proper place and positions'. He further said: 'that said five claims for several years last past have been worked as a group.'

"We recently passed upon a somewhat similar question in the case of Independence Placer M. Co. v. Hellman, 62 Idaho —, 109 P. 2d 1038, 1042, and said: 'One who has actual notice, that a prior locator is claiming a tract of mining ground and has done location work thereon and continued to do prospecting and assessment work on the property, is not in a position to make a valid location on such property. In such case he has notice that the ground is claimed by another and that so much of it as is claimed and occupied is no longer public domain subject to location; and he may not question the sufficiency of the original location or the character of the original occupant's title.' (Citing cases.) See sec. 38 of 30 U. S. C. A.; Humphreys v. Idaho G. M. Dev. Co., 21 Idaho 126, 120 P. 823, 40 L. R. A., N. S., 817; Allen v. Laudahn, 59 Idaho 207, 81 P. 2d 734.

"The location notice, stakes and boundary marking were evidently sufficient to adequately advise appellants of the location and identity of the claim, so that, *as to them,* there was no danger of respondents swinging the claim to take in ground not originally covered by the location, as denounced by appellants' authorities:'"

And this decision, it will be observed, reiterated a previous similar holding by the same court in Independence Placer Mining Co. Ltd., v. Hellman, 62 Idaho 180, 109 Pac. 2d 1038, 1042.

To the same effect is the still later case of Hayden Hill Etc. Co. vs. Lincoln Mining Co., 66 Idaho 430, 160 Pac. 2d 468 from the same jurisdiction. See also Hess vs. Moody, 35 Cal. App. 401, 95 Pac. 2d 699 holding that where the defendant attacked proof of labor of plaintiff's predecessors for a year prior to defendant's alleged location he thereby admitted knowledge of the

prior location and was precluded from attacking its sufficiency. See also Smart vs. Staunton, 29 Ariz. 1, 239 Pac. 514, 519.

In Houck vs. Jose, 72 Fed. Sup. 6, 10 infra, (June 14, 1947), this is said:

"But as between a locator in possession and a subsequent intruding locator, the law favors the locator who, in good faith, occupies mineral lands and does improvement work on them against the intruder who goes on the land which he knows has been located, claimed and occupied by another and tries to oust him by doing discovery work of his own. See Union Oil Co. of California v. Smith, 1919, 249 U. S. 337, 346, 39 S. Ct. 308, 63 L. Ed. 635; Rooney v. Barnette, 9 Cir., 1912, 200 F. 700; Cole v. Ralph, 1920, 252 U. S. 286, 287, 40 S. Ct. 321, 64 L. Ed. 567; United States ex rel. United States Borax Co. v. Ickes, 1938, 68 App. D. C. 399, 98 F. 2d 271, 274; Ricketts, op. Cit. Sections 731, 732, 734, 1101, 1102, 112."

In Yosemite Gold Mining and Milling Co. vs. Emerson ,208 U. S. 25, 28 S. Ct. 196, 52 L. Ed. 374 there were these facts as the court states:

"It appears in this record that McWhirter's location was made about three years after the Coyle location, and after the record of the notice and the marking of the claim on the grounds so that the boundaries could be readily seen. Furthermore it appears from the testimony of McWhirter:

'I knew the Jim Blaine Mine, formerly the Slap Jack Mine. I went on the property first on Saturday, December 31st, 1898. I went with James Paul. I looked over the ground. Mr. Paul showed me the boundaries of the claim. I ascertained the different points of the claim and the monuments. . . . When I was on the ground on December 31, 1898, I knew the boundaries of the Slap Jack Mine. They were pointed out to me by Mr. Paul on December 31, 1898.'"

Concerning this situation the court said:

"The object of posting the preliminary notice of the claim is to make known the purpose of the discoverer

to claim title to the same to the extent described, and to warn others of the prior appropriation. Lindley, Mines, 2d ed. § 350. In this case the locator had gone beyond this preliminary notice; the outlines of the claim had been marked, and the extent of the claim was fully known to McWhirter when he attempted his location. He know all about the location and boundaries of the claim that any notice could have given him. He undertook to locate his new claim precisely within the boundaries of the old one, and was seeking to take advantage of the want of compliance with the statutory requirement as to the amount of annual assessment work to be done. Having this knowledge, we hold that McWhirter, and those claiming under him, could not claim a forfeiture of title for want of preliminary notice under the former location."

It may be observed that it was established in the case that the assessment work had in fact been done, the trial court so finding.

Under the established rules under which we must view the evidence in a record on error or appeal as heretofore set forth, the outline of the testimony in support of defendants' locations, which does not undertake to be at all exhaustive for there was much corroborative evidence on behalf of the M-R locators besides, and the authorities which we have quoted above and which we regard as controlling under the circumstances disclosed, we are obliged to conclude that not only were the defendants' placer claims properly located (except perhaps the Milread No. 14 as regards its location certificate and notice due, evidently to a clerical error in typing, which was promptly cured when discovered), but also that plaintiffs were in no position to attack their validity. There can be no doubt that the Scoggin locators knew that the M-R locators were claiming the ground involved in the Milread No. 14 claim as it was exactly included in the Missouri Butte No. 2 Placer Mining Claim of defendants' predecessors, the Williams group and embraced in the

quit claim deed of record in the office of the county clerk and ex officio register of deeds of Crook County, which that group gave to Miller and Read when the two men last mentioned purchased the formers' interests in the premises.

Before leaving this branch of the case, it may be proper also to observe that there seems to be considerable criticism made by the plaintiffs that the timbers four inches square, twenty to thirty inches long used by the M-R locators to designate the surface boundaries of their claims were not "substantial posts" as required by Section 57-921 W. C. S. 1945 (W. R. S. 1931, Section 70-121). It would seem that there are several answers which can properly be made to this complaint. First, Plaintiffs having actual knowledge of the boundaries of the claims, are in no position to raise this question. Second, no authorities are cited which indicate that a timber of the size thus employed is not properly to be regarded as a post. True, our attention has been directed to the fact that Judge Lewis, speaking for the Circuit Court of Appeals of the 8th Circuit in the case of United States vs. Sherman, 288 Fed. 497 concerning the South Dakota statute which required the surface boundaries of a lode mining claim to be "marked by eight substantial posts" said:

"A stake is not a post. The latter signifies more permanance, and to sink it in the ground requires more effort and outlay, than to drive down a stake. It suggests larger proportion, is more readily seen than a stake." But the testimony recited in the opinion as taken from the record in that case does not appear to give the size of the stakes which were used. We can see that a piece of wood an inch square and twenty to thirty inches long might not be regarded as a "substantial post" but we are not inclined to think that a timber four inches square sunk in the ground ten or twelve inches of its twenty or thirty inch length might not fairly be regard-

ed as a "substantial post". A perusal of the texts on mining law and also the decisions of the appellate courts regarding matters of this character readily bring one to the conclusion that the use of the words "stakes" or "posts" would appear to be interchangeable.

It seems the plaintiffs had no difficulty in readily observing these timbers. Indeed, photographs taken by both the Scoggin and M-R locators and received in evidence show posts with bottles on, in close proximity with the United States Survey iron Government section corners which were quite as readily seen as these government corner markers themselves. We may note too that the official Manual of Instructions For The Survey Of The Public Lands Of The United States, 1930 edition, page 425, as to mineral surveys, after mentioning tubular iron posts, stones "at least twenty-four inches long, set sixteen inches in the ground" or a "rock in place" as proper corner monuments also says:

"If none of the foregoing material is available, a concrete post, 24 inches long, 6 inches square, set 16 inches in the ground, or hardwood post at least 3 feet long by 4 inches square, set 24 inches in the ground, and surrounded by a substantial mound of stone or earth, may be used."

These regulations appear also in the 1947 edition of the manual aforesaid.

Third, there was testimony received without objection that the four by four timbers employed were "substantial posts" and the trial court found that they were such. Whether these timbers were "substantial posts" would seem to be a question of fact and the trial court's finding upon substantial either undisputed or conflicting testimony, should stand. See J. E. Riley Inv. Co. vs. Skaow, 110 Fed. 2d (C. C. A. 9th Cir.) 345, 347.

It is also in this connection quite interesting to note the decision of the District Court of Alaska in Wagner

vs. Holland, 10 Alaska 40 where the territorial statute supplemented the federal law on the subject of marking mining claim boundaries by requiring the erection of monuments or posts at the corners and angles of mining claims of "not less than three inches in diameter". The posts or stakes in question were less than three inches in diameter. Concerning this particular statutory requirement the court said:

"Clearly the purpose of the supplementing act in question, requiring the erection of monuments or posts at the corners and angles of the location, is a reasonable and beneficial amendment to the old law. It helps to locate claims that have been previously made. It lessens the inconveniences confronting would be locators. It definitely shows to the world that another person has been upon the ground and appropriated it. But when the supplementing act goes further, and in effect declares that a claim is void and the land it covers is open to location by any one who comes along simply because the monuments or posts set up marking the corners and angles of it are less than three inches in diameter, especially where the would be claim jumper is able to see the posts and mounds set up by a prior locator showing that the claim has been previously located; does see them; follows them from corner to corner and restakes the claim; this Court is of the opinion that the part of the statute in respect to the size of the posts or monuments required to be placed at the corners and angles of the claim is directory only; and that any other view of the matter under the facts of this case would render such provision of the statute unreasonable."

It is obvious that no corner posts for any placer claim upon ground marked in accord with the system of United States Surveys of Public Lands could be set *exactly* upon the corners of the sections for these are marked with the official posts or markers precisely where they should be. It will be recalled that there was testimony that the M-R locators set their posts a few inches from the Government markers. That, we think,

should be regarded as sufficient. Relative to the practice of placing the notices of location in bottles, in Houck vs. Jose, 72 Fed. Supp. 6, supra, the court remarked:

"The photographic evidence shows that the boundaries were clearly marked with posts which indicated the sections claimed, that notices of location of the placer claims were posted, placed in jars near the post where they could not be destroyed by the elements,"

and thereupon the comment was made that this is:

"what mining authorities consider good practice." (City Ricketts, American Mining Law, 4th Ed. 1943, Sections 616, 695).

It is said that the M-R locators failed to file in the office of the county clerk and ex officio registrar of deeds of Crook County on or before twelve o'clock meridian on July 1, 1944 either affidavits of performance of or claims for exemption from annual labor for the year ending June 30 or July 1, 1944 and consequently the defendants forfeited their rights in said mining claims. We do not think so. It is in evidence that an exemption notice was filed for these claims in said office at nine A. M. on July 3, 1944. June 30 of that year, the date of the exemption notice was a Friday and the office aforesaid was operating under fast or war time. July 1 was Saturday and that office was closed at eleven A. M. standard time. July 2 and 3 were, of course, Sunday and Monday respectively. There is no proof of hostile intervening rights accruing to anyone during the period July 1 at eleven A. M. or twelve o'clock noon and July 3, 1944 during which period the clerk's office aforesaid remained closed. The record discloses, too, that an effort was made in good faith with no intention to abandon their claims on the part of the M-R locators to comply with the requirements of the Act of Congress of May 3, 1943, Ch. 91, 57 Stats. 74, supra.

In Pine Grove Nevada Gold M. Co., — Nev. —, 171 Pac. 2d 366, 378 the court discussing a failure on the part of the plaintiff in that case to file the notice of suspension of labor under the 1943 Act of Congress last above mentioned on or before July 1, 1944 but which was actually filed December 14, 1944 said:

"As above stated, the plaintiff resumed taking the necessary steps to protect its said unpatented mining claims, by filing, on the 14th day of December, 1944, in the office of the county recorder of Lyon County, a Notice of Suspension of Labor and Intention to Hold said claims for the year commencing at 12 o'clock meridian July 1, 1944, and ending at 12 o'clock meridian July 1, 1945, under the provisions of H. R. 2370, approved May 3, 1943. This act of filing said notice did not operate retroactively to invalidate the relocations previously made, while the plaintiff was in default by the failure to file the required notice for the previous assessment year, 1943-1944, but said filing of the notice on December 14, 1944, had the same effect as a resumption of work would have had under like circumstances."

After holding valid certain relocations of the ground claimed by plaintiff which were made by the defendant subsequent to July 1, 1944 but before December 14, 1944 the court also said:

"A different situation exists, however, as to the defendants' relocations known as Protection No. 3 and Protection No. 4. As has been hereinbefore stated, these two relocations were not made until June 28, 1945, more than six months after the unpatented claims of plaintiff had ceased to be open to relocation. Plaintiff had filed its Notice of Suspension of Labor and Intention to Hold, as aforesaid, on December 14, 1944, and same had the full effect of a resumption of work, and was for the year commencing July 1, 1944, and ending July 1, 1945. June 28, 1945, was, of course, within that assessment year. The Plaintiff's said claims would not have been again open to relocation until July 1, 1946. They would have again become open to relocation at 12 o'clock meridian July 1, 1946, provided no assess-

ment work was performed, or no improvements were made, upon or for them in the meantime, unless on or before that date a notice of suspension for the assessment year from July 1, 1945, to July 1, 1946, were filed. "The relocations of the said two last mentioned claims, Protection No. 3 and Protection No. 4, were invalid, and the title of plaintiff's unpatented mining claims lying and being within the exterior boundaries of said Protection No. 3 and Protection No. 4 should have been quieted within plaintiff."

An earlier decision of the Supreme Court of Colorado in Field vs. Tanner, 32 Colo. 278, 75 Pac. 916 involving similar circumstances under similar statutory requirements was approved and followed. See also Moodey vs. Dale Consolidated Mines, 81 Fed. 2d (C. C. R. 9th Cir.) 794.

2 Lindley on Mines (3d Ed.) 1568, Section 632 says that:

"The law fixes no time within the year when the work must be done. Consequently, if done at any time during the year, it is enough, and there can be no forfeiture until the entire year has elapsed."

Morrison's Mining Rights (16th Ed.) 114 is to the same effect as follows:

"The owner has the whole of each annual period in which to do the work or make his improvements.— *Belk v. Meagher*, 3 Mont. 65, 1 M. R. 522; *Atkins v. Hendree*, 1 Ida. 95, 107, 2 M. R. 328; *Mills v. Fletcher*, 100 Cal. 142, 34 P. 637, 17 M. R. 671; *Mesmer v. Geith*, 22 F. (2d) 690.

"It therefore follows that if, for instance, he has expended $100 during the month of July of the first year he may wait until July 1, before noon of the second year before he does or resumes his second year's work. That such is the law admits of no doubt upon the reading of the Act."

And in Griffith vs. Noonan, 58 Wyo. 395, 133 Pac. 2d 375 this court has held that subsequent locators whose mining claim was located on a date when the time for

doing the proper assessment work under an original location had not expired, had no such interest in the property as would permit them to raise the question whether the original locators had done their proper assessment work, and that any attempted location or relocation of the land by other prior to the expiration of that time was void, and consequently that the original locators might not have done their proper assessment work subsequently, could not aid the others.

Under these rulings it would appear that in November 1944 when the Scoggin locations were made, the land upon which they were undertaken to be placed so as to be in conflict with the M-R locations, was not open to be taken and the Scoggin claims so located were and are void.

Section 299 of Title 43, U. S. C. A. (Act of Congress, December 29, 1916 Ch. 9, Section 9, 39 Stats. 865) provides in part:

"Any person who has acquired from the United States the coal or other mineral deposits in any such land, or the right to mine and remove the same, may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal of the coal or other minerals, first, upon securing the written consent or waiver of the homestead entryman or patentee; second, upon payment of the damages to crops or other tangible improvements to the owner thereof, where agreement may be had as to the amount thereof; or, third, in lieu of either of the foregoing provisions, upon the execution of a good and sufficient bond or undertaking to the United States for the use and benefit of the entryman or owner of the land, to secure the payment of such damages to the crops or tangible improvements of the entryman or owner, as may be determined and fixed in an action brought upon the bond or undertaking in a court of competent jurisdiction against the principal and sureties thereon, such bond or undertaking to be in form and in accordance with rules and regulations prescribed by the Secretary of the Interior and to be

filed with and approved by the register of the local land office of the district where in the land is situate, subject to appeal to the Commissioner of the General Land Office:"

Under this section it seems to be urged that the M-R locators had and could have no rights upon the lands in controversy until they had settled with Scoggin as the owner of surface rights thereon as to damages to these rights or had given a bond as the statute directs. We can not agree that this should be so. In the first place, there is evidence for the defendants in the record that Scoggin told Miller, one of the M-R locators, in substance that he (Scoggin) was not interested in the matter of damages to surface rights and that he wanted the bentonite. Secondly, these lands held by Scoggin were not clearly identified, at least as regards lands held by him from the Government under absolute conveyance from it of the surface rights with the reservation to it of the minerals. The major portion of his holdings of surface rights seem to have been under United States Government lease pursuant to what is commonly known as the Taylor Grazing Act (1946 Cum. Ann. Pocket Part U. S. C. A., Title 43, Sections 315 et seq., pp. 48-59 incl.) hereinbefore mentioned.

Section 315e of that act—a statute enacted much later than Section 299, supra—declares that:

"Nothing contained in sections 315-315m, 315n, 315o and 315o-1 of this title shall restrict the acquisition, granting or use of permits of rights-of-way within grazing districts under existing law; or ingress or egress over the public lands in such district for all proper and lawful purposes; and nothing contained in such sections shall restrict prospecting, locating, developing, mining, entering, leasing, or patenting the mineral resources of such district under law applicable thereto."

In Section 160.30 p. 275 of Title 43 of Vol. II, Code of Federal Regulations of the United States, the form

to be used in a lease under the Taylor Grazing Act aforesaid is prescribed. Therein the first reservation (p. 276) in favor of the lessor (the United States of America) substantially incorporates the provisions of 315e supra as follows:

"The lessor expressly reserves:

(a)   The right to permit prospecting, locating, developing, mining, entering, leasing or patenting the mineral resources, and to dispose of such resources under any laws applicable thereto; the right to permit the use and disposition of timber on the lands embraced in this lease, under existing laws and regulations; and nothing herein contained shall restrict the acquisition, granting, or use of permits or rights of way under existing law."

In McMillin vs. Magnuson, 102 Colo. 230, 78 Pac. 2d 964, 972, 973 after quoting the statute (Section 299 of Title 43 U. S. C. A. supra) the court well said:

"It is conceded that consent to the prospecting or mining operations was not given by the patentee, and that no bond was filed by the lode claimants until July, 1934, a considerable time after locations were made. Upon this premise plaintiffs in error assert that the lode locations were initiated in trespass, and therefore are invalid. It is evident the statute contemplates that a person qualified to locate mineral deposits may at all times enter the homestead to prospect for mineral therein, and, as a necessary incident to this right, locate under the appropriate act such mineral as he may discover, subject only to his liability to the homestead entryman or patentee for damages to crops and the prohibition against injury to permanent improvements. Having made his location, and thereby secured the right to remove the minerals, in the words of the statute he 'may reenter' and occupy so much of the surface as may reasonably be required in his mining operations by securing the consent of the homesteader, paying the damages caused by his operations, or filing the required bond. The securing of the patentee's consent, or in lieu thereof posting the bond, is not a condition precedent to the location, but is incident to the mining operations subsequent thereto. Further, the clear purpose of the

statute is not to restrict prospecting and mining operations on lands entered or patented under the Stock Raising Homestead Act, but to assure compensatory protection to the homesteader. A controversy on this score must be between the mineral locator or operator and the homestead entryman or patentee in such capacities, and can have no bearing on the rights of claimants under conflicting mineral locations."

It was accordingly decided that a lode claimant's failure to file the statutory bond prior to commencing mining operations would not invalidate the lode location so far as hostile placer claimants of the land were concerned. And it may be noted also that the pleadings in the case at bar present no such issue between Scoggin himself and the M-R locators. Our attention has not been directed either to any proof submitted on this point even if it were properly involved in this controversy.

The M-R locators in their amended answer and cross petition disclaim any interest in the SE¼ of the NW¼, the SW¼ of the NE¼ of Section 9 and also in the N½ of the NE¼ and the SE¼ of the NE¼, all in Township 57 N., Range 65 W. of the 6th P. M. of Section 10. In the course of the trial they also disclaimed any interest in the SW¼ of the SE¼ of Section 3 presumably in the same township and range, though these are not stated. So far as these lands are included in any mining claim or claims of the Scoggin locators, the possessory title to which and right of possession thereof sued for in this action, the judgment should be modified accordingly, awarding to the Scoggin locators the disclaimed ground. The district court and counsel should have no difficulty in agreeing on the proper form of this modification.

Finally, we are inclined to think that what has above been said disposes of the principal contentions submitted in behalf of the appellants in their criticism of the

judgment of the district court of Crook County herein under review. We may say, nevertheless, that we have given careful consideration to all points advanced in their behalf, and also that many other reasons could readily be given in support of the conclusion we shall announce. Our conclusion, therefore, must be, without further prolonging this already extended opinion, that the judgment of the district court aforesaid, as modified in the particulars indicated in the preceding paragraph, should be affirmed.

*Modified and Affirmed.*

KIMBALL, J., and BLUME, J., concur.